UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOSEPH PERRONE,

                          Plaintiff,

          -against-                                    **09-CV-0316 (AKT)**

ROSE ANN AMATO and
JACK AMATO,

                          Defendants.

-------------------------------------------------------------x


# POST-TRIAL MEMORANDUM OF LAW OF PLAINTIFF JOSEPH PERRONE


Donald H. Hazelton, P.C.
Attorney for Plaintiff
DHH7876
245 Hillside Avenue
Williston Park, New York 11596
Telephone: (516) 742-7200

## PRELIMINARY STATEMENT

Plaintiff Joseph Perrone respectfully submits his Post-trial Memorandum of Law. This diversity action commenced in January of 2009 is governed by the substantive law of New York. The Stipulated Facts are set forth in Section VII. of the Joint Pre-Trial Order.

## Summary of the Evidence

Defendants had been paying rent to Anna Perrone in the amount of $1,000.00 per month and ceased paying rent immediately after Anna suffered her stroke on May 28, 2004 but continued to reside in the premises at 632 Jefferson Street, West Hempstead, New York (the "Premises') until June of 2006. Stipulated Facts, Nos. 8-10.

At the time of her stoke, Anna Perrone was receiving monthly pension income in the sum of $566 ($6,792 per annum), monthly social security income in the sum of $1,139 ($13,668 per annum) and a lifetime payment from workers' compensation in the sum of $320 every two weeks (26 weeks x $320 = $8,320 per annum). This monthly income of approximately $2,398.33, with cost of living increases, continued until Anna's death in October of 2008. On May 28, 2004, Anna Perrone owned the Premises free of any liens and was self-supporting. At the time of her stroke, Anna had cash assets of at least $30,000.00 (Testimony of Joseph Perrone, pp. 25, 78-80, 89-91; testimony of Rose Ann Amato, pp. 206-207; Plaintiff's Exhibit 19-F in evidence) and had a checking account in her sole name at HSBC Bank into which her social security, pension and worker's

1

compensation income was deposited.   (Plaintiff's Exhibit 19 in evidence; testimony of Rose Ann Amato, p. 351).

After May 28, 2004, Rose Ann Amato regularly wrote checks and withdrew money from Anna's HSBC checking account to pay defendants' personal obligations and obligations of the Amichi Restaurant, Inc ("Amichi"), a pizza restaurant owned by Rose Ann Amato and operated by Jack Amato.   This misappropriation by Rose Ann Amato began soon after Anna suffered her stroke and continued until after Anna's death.   Jack Amato testified that Amichi was really his company and was only put in his wife's name to deceive the New York State Liquor Authority. (Testimony of Jack Amato, pp. 355-358, 361).

On December 27, 2004, plaintiff, Rose Ann Amato and Jack Amato attended a meeting with John E. Ryan, Esq., an attorney who had represented Anna Perrone.   Jack Amato was present at and participated in this meeting. (Testimony of John E. Ryan, Esq., pp. 401-407; Perrone testimony, pp. 31-34; Stipulated Fact No. 12).   Plaintiff and both defendants had attended a prior meeting with an attorney before meeting with Mr. Ryan in which a plan to transfer the Premises to Rose Ann with a side agreement between Rose Ann and plaintiff had been discussed. (Perrone testimony, pp. 31, 72-73).

At the meeting with Mr. Ryan, it was decided and agreed that the Premises would be transferred to Rose Ann Amato with Anna Perrone reserving a life estate and it was further agreed that the net proceeds of sale of the Premises would be equally divided between Joseph Perrone and Rose Ann

2

Amato upon the sale of the home or the death of Anna Perrone. (Testimony of John E. Ryan, Esq., pp. 401-407).

At the meeting with Mr. Ryan, Jack Amato learned that the Premises would be transferred to Rose Ann Amato since she had been living in the Premises for over ten (10) years and was a child of and caregiver to Anna Perrone, with Anna Perrone retaining a life estate in the Premises, all subject to the agreement of Rose Ann Amato that upon the death of Anna Perrone, or upon the sale of the Premises, whichever occurred first, that plaintiff would receive from Rose Ann Amato one-half of the Premises or one-half of the net proceeds from the sale of the Premises. (Testimony of John E. Ryan, Esq., pp. 401-407).

On February 8, 2005, title to the Premises was deeded by Anna Perrone, as grantor, by a deed signed by plaintiff as her attorney-in-fact under a durable power of attorney, to Rose Ann Amato, as grantee, with Anna Perrone retaining a life estate, and the agreement dated February 8, 2005 (the "Agreement"), prepared by Mr. Ryan, was signed by plaintiff and Rose Ann Amato. Stipulated Facts, Nos. 16, 18-20; Testimony of John E. Ryan, Esq., pp. 401-407).

In August of 2005, a convenience account was established in the name of Rose Ann Amato and plaintiff at HSBC Bank and funded with assets of Anna Perrone to be used for her benefit. (Stipulated Facts Nos. 26-27; Perrone testimony. pp. 37-38).

In late summer of 2005, plaintiff Joseph Perrone told Rose Ann Amato that she could not continue to care for their mother by herself and that professional

3

aides needed to be hired to take care of Anna Perrone. (Perrone testimony, pp. 40-46).

In October of 2005, home health aides from an agency named Aging At Home, Ltd. ("Aging At Home") began caring for Anna Perrone and were initially paid from the assets of Anna Perrone, not from funds belonging to Rose Ann Amato or Jack Amato. After April of 2006, payments to the aides from Aging At Home also were made from funds from a certain reverse mortgage line of credit taken out on the Premises as well as from the assets of Anna Perrone. (Testimony of Joseph Perrone, pp. 44-48; Plaintiff's Exhibits 19C, 19D in evidence).

In early 2006, defendants told plaintiff that Anna Perrone was running low on money. Stipulated Fact No. 21; Perrone testimony pp. 46-47. At that time, neither Rose Ann Amato nor Jack Amato indicated to plaintiff that they had spent any of their own money for the care of Anna Perrone. (Perrone testimony, pp. 46-47). Plaintiff took steps to secure a reverse mortgage on the Premises. (Perrone testimony, pp. 47-48).

On April 29, 2006, a reverse mortgage line of credit (sometimes referred to as the "reverse mortgage') was taken out on the Premises. Stipulated Fact No. 22. This created a first mortgage lien on the Premises. Stipulated Fact No. 23. The reverse mortgage was signed by Rose Ann Amato and by Joseph Perrone as attorney-in-fact for Anna Perrone, who held the life estate, as mortgagors. Stipulated Fact No. 24. As monthly advances were made by the lender, the mortgage lien on the Premises increased.

4

The borrower on the reverse mortgage was Anna Perrone, not Rose Ann Amato. (Plaintiff's Exhibit 5 in evidence; testimony of Joseph Perrone, pp. 176-177). The purpose of the reverse mortgage was to provide funds for the care and support of Anna Perrone. (Testimony of Joseph Perrone, pp. 46-47).

The draw downs on the reverse mortgage were made monthly and deposited to the HSBC checking account (account ending in 8600) in the name of Rose Ann Amato and Joseph Perrone during the period from May of 2006 through March of 2008. Stipulated Facts Nos. 28-29. The draw on the line of credit was agreed by plaintiff and Rose Ann Amato to be $4,500.00 per month and that was the amount to be deposited to the HSBC joint account. (Testimony of Joseph Perrone, pp.46-50; testimony of Rose Ann Amato, pp.242-46).

After April 2006, Rose Ann Amato secretly diverted money from the reverse mortgage to pay her personal obligations and obligations of her husband, Jack Amato, and a Florida corporation named Jack's Pizzeria, Inc., (the 'Pizzeria"), a pizzeria restaurant 100% owned by Rose Ann Amato until July of 2009. (Stipulated Facts, 59-70).

In May 2007, Anna Perrone was moved to Florida by defendants and began residing in the Nature's Edge assisted living facility. Stipulated Fact No. 35. Thereafter, Anna resided at the Palms of Port St. Lucie until her death in October of 2008. The cost of these facilities, which provided 24 hour care, was paid from the proceeds of the reverse mortgage and from Anna's own HSBC checking account funds. (Testimony of Rose Ann Amato, pp. 235, 232-234; Perrone testimony, pp 47-50; Plaintiff's Exhibit 21 in evidence).

5

In September of 2006, without the knowledge of plaintiff, Rose Ann Amato wrongfully increased the monthly draw on the reverse mortgage from $4,500.00 to $6,000.00 by forging her mother's signature to a letter dated September 18, 2006. In that letter, Rose Ann Amato wrote: "My name is Anna Perrone 632 Jefferson Street West Hempstead, New York 11552. I would like to change my monthly payments of $4500.00 a month to $6,000.00 a month. I understand this would reduce the number of monthly payments I have." (Stipulated Facts Nos. 33, 34; Plaintiff's Exh. 12 in evidence). On October 9, 2007, Rose Ann Amato again, without the knowledge of plaintiff, increased the monthly draw down on the reverse mortgage from $6,000 per month to $9,000 per month by forging Anna Perrone's name to a Bank of America Change of Payment Request Form dated October 9, 2007 and transmitting said form to the Bank of America. Stipulated Fact No. 37; Testimony of Rose Ann Amato, pp. 262-67).

In March 2008, Rose Ann Amato opened a bank account at the Bank of America in her individual name and the name of her mother, Anna Perrone. Stipulated Fact No. 38. Anna Perrone was not capable of participating in the opening of a bank account and was not capable of signing her name or writing a check after her stroke. (Stipulated Fact Nos. 2, 71).

In March 2008, Rose Ann Amato delivered an altered New York durable power of attorney dated May 20, 2003 in the name Anna Perrone, as principal, to the Bank of America. Rose Ann Amato fraudulently altered that power of attorney by writing her mother's initials "AP". in the space on the power that allowed her to act alone as an agent. Rose Ann Amato represented herself as

6

the agent for Anna Perrone under this altered power of attorney and directed the Bank of America to wire funds in the sum of $9,000 per month from the reverse mortgage directly into said bank account. She then used substantial amounts of those funds to benefit herself, her husband and the Pizzeria. (Testimony Rose Ann Amato, pp. 264-67; Stipulated Facts Nos. 13-18, 39-40, 59-72; Plaintiff's Exh. 16: Plaintiff's Exh. 6 contains copies of the altered and unaltered power of attorney).

The Premises were sold on June 23, 2008 for a purchase price of $537,500.00. At the time of the closing of sale of the Premises, the balance due the Bank of America on the reverse mortgage was $235,850.94. This amount was paid off at the closing of sale. Stipulated Facts, Nos. 42-45. At the time of the closing, plaintiff was in the hospital recovering from spinal surgery. (Perrone testimony, pp. 62-64). After the closing, while plaintiff was recovering from surgery, plaintiff asked Rose Ann how the closing went. Rose Ann's reply was we will talk about it when you get better. (Perrone testimony, pp. 62-65).

Rose Ann Amato deposited the net proceeds of the sale of $267,032.04 to a joint bank account in her name and the name of Jack Amato at the Bank of America. The substantial portion of the net proceeds were placed in a Bank of America CD in the joint name of Rose Ann Amato and Jack Amato in trust for their four adult children. (Testimony of Jack Amato, pp. 372-374, 387; Testimony of Rose Ann Amato, p. 253; Plaintiff's Exh. 15 in evidence). These deposits were made by Rose Ann Amato without the knowledge or consent of plaintiff. Plaintiff only learned the details of the closing shortly before this suit was commenced.

7

He learned those details by going to the attorney's office who represented Rose Ann at the sale and obtained a copy of the closing statement. (Perrone testimony, pp.64-66).

Rose Ann Amato subsequently received a check in the sum of $2,500.00 representing the return of an escrow held back at the closing, making the total net proceeds received by her from the sale the amount of $269,532.04. Stipulated Facts, Nos. 47-49. Anna Perrone died on October 24, 2008. Stipulated Fact No. 51. None of the proceeds of sale have been paid to plaintiff.

From the time of its incorporation in July 2007 through July of 2009, Rose Ann Amato was the sole officer, director and shareholder of the Pizzeria. Stipulated Facts, Nos. 56-58. In July of 2009, Rose Ann Amato transferred to Jack Amato, without consideration, ninety percent (90%) of her shares of stock of the Pizzeria. (Testimony of Rose Ann Amato, pp. 251-252; Plaintiff's Exhibits 25-27, 62-63 in evidence).

## ARGUMENT

### POINT I.

### PLAINTIFF IS ENTITLED TO JUDGMENT AGAINST DEFENDANTS FOR FUNDS WRONGFULLY DIVERTED FROM THE REVERSE MORTGAGE

Rose Ann Amato misappropriated at least the sum of $47,401.44 from the reverse mortgage in the form of payments by checks signed by her to, among others, (i) HSBC Mortgage Corp. USA, the holder of the mortgage in the name of defendants on a home in Florida; (ii) DCL St. Lucie West, LLC, the landlord of the Pizzeria, for rent for the Pizzeria, a business owned by Rose Ann Amato and operated by Jack Amato (iii) Lake Charles HOA for homeowners' dues owed by

8

Rose Ann Amato and Jack Amato and (iv) various creditors of defendants and contractors and suppliers of the Pizzeria. (Stipulated Facts, Numbers 63, 64-68, 69; testimony of Rose Ann Amato, pp. 270-275, 276-280, 286-287; Plaintiff's Exhs., 34-B and 15 in evidence.

The payments in the amount of $47,401.44 have been admitted by defendants. (Stipulated Facts, pp. 13-18, Paragraphs 59-70). It is admitted that these payments were made without the knowledge or consent of plaintiff. (Stipulated Fact No. 72). Thus, the diversion of the sum of $47,401.44 from the reverse mortgage for the benefit of defendants and the Pizzeria is an admitted fact and this amount should be added to plaintiff's damages of one-half of the net proceeds of sale.

Rose Ann Amato told Joseph Perrone on only one occasion that she had expended money for her mother, Anna Perrone – at the time of the closing of the reverse mortgage in April of 2006. At that time, Rose Ann Amato said she was owed $20,000.00 for money she had laid out for Anna but did not provide any specifics. (Perrone testimony, pp. 48-49). Rose Ann Amato reimbursed herself in that amount from the initial funds in the sum of $24,485.00 received at the closing of the reverse mortgage. (Testimony of Joseph Perrone, pp. 48-50; testimony of Rose Ann Amato, pp. 241-242; Plaintiff's Exhibit 19-B in evidence; Stipulated Fact No. 28 as to the amount of $24,485.00). There was no evidence to show that Rose Ann ever expended any money for her mother's care. The evidence shows just the contrary. Therefore, that $20,000 sham reimbursement

9

was a diversion of the reverse mortgage and should be added to plaintiff's damages.

Furthermore, Rose Ann Amato misappropriated at least an additional $6,000.00 from the reverse mortgage in the form of a check (No. 317) dated 12-5-2007 signed by her, made payable to cash and endorsed by her. The check was drawn from the joint account at HSBC into which the line of credit funds were deposited at that time. There was no credible explanation for Roe Ann paying herself $6,000 in cash. Testimony, Rose Ann Amato, pp. 280, 287; Plaintiff's Exhibit 34E, Check No. 317, dated 12-5-07.

The diversions from the reverse mortgage amount to at least $73,401.44. One-half of that amount or $36,700.72 should be added to plaintiff's damages of $134,766.02 making his total damages on his first claim $171,466.74. The Court previously sustained plaintiff's claim for a constructive trust on amounts diverted from the reverse mortgage to or for the benefit of defendants. Order dated August 30, 2010.

## POINT II.

## DEFENDANTS SPENT NONE OF THEIR MONEY FOR THE CARE OF ANNA PERRONE

Defendants offered no evidence in the form of cancelled checks, receipts or personal bank records showing that they made any expenditures from their own funds for the care of Anna Perrone. (Testimony of Rose Ann Amato, pp, 225, 309). Furthermore, any purported claim for reimbursement would lie against the Estate of Anna Perrone.

10

Anna Perrone was hospitalized and in a rehabilitation facility from May 28, 2004 until October of 2004. There were no home health aides taking care of Anna at her home during this period as she was not living at home during this time. Any health aides who occasionally stayed with Anna at night during the period of her hospitalization were paid from Anna's own funds. (Testimony of Joseph Perrone, pp. 181-183; Plaintiff's Exhibit 19-E in evidence).

After Anna returned to the Premises in October of 2004, home health aides were provided by Medicare for about four weeks. These aides were paid by Medicare. (Perrone Testimony, pp. 27-28; testimony of Rose Ann Amato, pp. 202-203).

Rose Ann Amato was the primary caregiver for Anna Perrone during the period from November or December of 2004 until October of 2005. During this period, Rose Ann Amato occasionally hired "babysitters" to take care of her mother when Rose Ann needed a break and Rose Ann paid those babysitters from Anna's checking account at HSBC Bank. (Perrone testimony, pp. 26-30, 36-37, 40-46, 106-107; Plaintiff's Exh. 19-E in evidence; testimony, Jack Amato, pp. 360-361).

During the period from April of 2006 until Anna was moved to Florida in May of 2007, Rose Ann Amato never told plaintiff that the cost of Anna's care was exceeding the money coming in each month from the reverse mortgage and the other monies Anna was receiving monthly from social security, her pension, and workers' compensation. (Perrone testimony, pp., 59-60).

11

The aides from Aging At Home were paid through Anna Perrone's HSBC checking account and subsequently from funds from the reverse mortgage line of credit. (Plaintiff's Exhibits 19-C, 19-D, 20, 34-C, 34-D and 34-E in evidence). Rose Ann Amato was aware of the cost of monthly care for Anna in April of 2006 and she agreed that the monthly draw down on the reverse mortgage was to be $4,500.00 per month to cover the cost of Anna's care. (Testimony of Rose Ann Amato, pp. 244-246). Plaintiff's Exhibit 34-E shows checks payable to cash drawn on the joint account ending in 8600 in the name of Rose Ann Amato and Joseph Perrone. According to Rose Ann Amato, these checks were payments to the aides. (Testimony of Rose Ann Amato, pp. 256-262). These checks total approximately $65,000.00.

The contention by defendants that they were using cash from Amichi to pay for aides was not credible. Rose Ann testified that they were "making a living" at Amichi as did Jack Amato. (Testimony of Rose Ann Amato, p. 210; testimony, Jack Amato, p. 363). Rose Ann also testified that she and her husband could not afford health insurance in July of 2005 at the time of the sale of the Amichi. (Testimony of Rose Ann Amato, p. 210). The subpoenaed bank records of Amichi show that during 2004 and 2005 that Amichi was barely managing to pay its bills. (Plaintiff's Exhibit 37 in evidence). Defendants apparently want the Court to believe that during the period from December 2004 until October 2005 that they were regularly taking out "cash" from Amichi in the amount of approximately $1,870.00 per week to pay for 18 hour per day home health aides for Anna Perrone at the rate of $15.00 per hour. (Testimony, Rose

12

Ann Amato, pp. 305, 307, 317-318). There is no credible evidence in the record to support this contention. Defendants paid nothing for the care of Anna Perrone and in fact began misappropriating her assets soon after her stroke (Plaintiff's Exhibit 19-A, 19-B in evidence).

During the period from the time of Anna's stroke until Anna's HSBC checking account was closed in October of 2008, Rose Ann Amato forged Anna name to numerous checks to pay personal obligations of Rose Ann Amato, Jack Amato as well as business obligations of Amichi including tax obligations of Amichi, a payment owed the New York State Liquor Authority by Amichi, mortgage payments on the building in which the Amichi restaurant was located, credit card bills of defendants, mortgage payments to HSBC Mortgage Company owed by defendants for their home in Florida, homeowners' dues by defendants to their homeowners' association in Florida. These payments total in excess of $32,000. (Plaintiff's Exhibit 19-A in evidence; testimony of Rose Ann Amato, pp. 212-221).

Although funds misappropriated by Rose Ann for her own benefit and the benefit of her husband and Amichi from Anna's HSBC checking account are not part of plaintiff's damages, they completely undermine defendants' argument that they were using their own money to care for Anna Perrone. The misappropriations show a pattern of outright theft that started soon after Anna's stroke.

### POINT III.

### PLAINTIFF IS ENTITLED TO JUDGMENT AGAINST DEFENDANTS UNDER SECTIONS 276 AND 273 OF THE DEBTOR AND CREDITOR LAW

a. Section 276 of the Debtor and Creditor Law

In July of 2009, Rose Ann Amato transferred 90% of her shares of capital stock in the Pizzeria to her husband, Jack Amato, with Jack Amato providing no consideration for the transfer. After the transfer, Jack Amato owned 90% of the shares of the Pizzeria with Rose Ann Amato owning 10% of the shares. This transfer of shares to Jack Amato occurred approximately six months after this lawsuit was commenced. (Testimony of Rose Ann Amato, pp. 251-252; Plaintiff's Exhibits 25-27, 62-63 in evidence).

On June 23, 2008, Rose Ann Amato received solely in her name the $267,032.03 in net proceeds from the sale of the Premises. She placed those net proceeds in joint accounts in the name of Rose Ann Amato or Jack Amato. There was no consideration for these transfers. (Testimony of Jack Amato, pp. 372-374; testimony of Rose Ann Amato, pp. 281-83; Plaintiff's Exhibits Nos. 15 and 29 in evidence). Each joint tenant, when money is held in a joint bank account, has the right during the lifetime of both tenants, to alienate his one-half interest and each tenant also has an inchoate right of survivorship with respect to the other tenant's share. Gotte v. Long Island Trust Co., 133 A.D.2d 212, 518 N.Y.S.2d 991 (2nd Dept. 1987); Matter of Giacalone, 143 A.D.2d 749, 533 N.Y.S.2d 457 (2nd Dept. 1988).

The diversions from the reverse mortgage for the benefit of Jack Amato and the Pizzeria were made without consideration and made without the knowledge of Joseph Perrone. (Stipulated Facts, Nos. 59-70, 72).

14

Rose Ann Amato made these transfers with the actual intent to hinder, delay or defraud plaintiff of his one-half share of the proceeds of sale. Furthermore, the diverted proceeds from the reverse mortgage increased the mortgage lien on the Premises, diminishing the equity in the Premises resulting in a further depletion of the value of the proceeds of sale. The evidence shows that the transfers were made by Rose Ann Amato to Jack Amato with the actual intent to hinder, delay or defraud plaintiff.

Section 276 of the New York Debtor and Creditor Law provides that:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and further creditors." (emphasis added).

To have standing, a plaintiff must be a creditor of the transferor. Only an actual intent to delay or hinder need be established; not an actual intent to defraud.    Hassett v. Goetzmann, 10 F.Supp.2d 181, 188 (N.D.N.Y. 1998). Section 276 does not require proof of unfair consideration or insolvency. Lack of fair consideration gives rise to a rebuttable presumption of fraudulent intent. U.S. v. Carlin, 948 F.Supp. 271, 277 (E.D.N.Y.1996).

Actual intent is rarely established by direct evidence. Actual intent is most often inferred from the circumstances surrounding the transaction commonly referred to as "badges of fraud." Thus a plaintiff is allowed to rely on "badges of fraud" to prove his claim under section 276. In re Sharp Intern. Corp., 403 F.2d 43, 56 (2nd Cir. 2005). These badges of fraud are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference

of intent." <u>Wall St. Assocs. v. Brodsky,</u> 257 A.D.2d 526, 529, 684 N.Y.S.2d 244 (1st Dep't. 1999).

Badges of fraud have been held to include "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim . . . and retention of control of the property by the transferor after the conveyance." <u>Id</u>. (cited by Judge Platt in his Memorandum and Order dated August 30, 2010). Transfers between members of a family raise red flags and receive different scrutiny. Memorandum and Order of Judge Platt dated August 30, 2010 p. 24 citing <u>In re Jacobs,</u> 394 B.R. 646, 661 (E.D.N.Y. 2006).

A conveyance by a wife to her husband or vice versa will always be carefully scrutinized and as to creditors it is open to the presumption of fraud. <u>Hirschhorn v. Hirschhorn</u>, 294 A.D.2d 404, 742 N.Y.S.2d 118 (2nd Dep't. 2002). This Court previously held that plaintiff has creditor status. (Memorandum and Order dated August 30, 2010, p. 26). N.Y. Debt. & Cred. Law Section 270; <u>Drenis v. Haligiannis</u>, 452 F.Supp.2d 418, 428 (S.D.N.Y. 2006).

The transfers by Rose Ann Amato to Jack Amato were made at a time when Rose Ann Amato knew she was indebted to plaintiff under the Agreement, were made without fair consideration to a close family member to wit, her husband, were not made in the usual course of business, resulted in control over the transferred assets by Jack Amato and thus bear classic "badges of fraud". A concurrence of several badges of fraud is indicative of a strong case for setting

aside the transfers. <u>Gafco, Inc. v. H.D.S Mercantile Corp.</u>, 47 Misc.2d 661, 263 N.Y.S.2d 109, 114-15 (Civ. Ct. N.Y.C. 1965) (Efforts by a debtor to hinder or delay his creditors by placing his property where he can still enjoy it and at the same time require his creditors to remain unpaid are condemned by law).

Punitive damages may be awarded in a fraudulent conveyance case under section 276 only where the conduct of the defendant was "gross and wanton and involved high moral culpability." <u>Blakeslee v. Rabinor</u>, 182 A.D.2d. 390, 392, 582 N.Y.S.2d 132 (1st Dep't. 1992), <u>lv. denied</u>, 82 N.Y.2d 655 (1993).

Here we have a case of misappropriation by defendants of plaintiff's property interest in the Premises in addition to a claim of fraudulent conveyance. In <u>Keen v. Keen</u>, 113 A.D.2d 964, 966, 493 N.Y.S.2d 636, 638 (3rd Dep't. 1985), <u>lv. dismissed</u>, 67 N.Y.2d 646, 499 N.Y.S.2d 683 (1986), the Court upheld an award of punitive damages noting that the acts complained of were calculated not only to defeat plaintiff's right in a money judgment but also "in effect, to misappropriate her own property interest" in a corporation. The Court found that this was "the kind of morally culpable conduct which justifies punitive damages." <u>Id</u>. Here, the conduct of defendants was gross and wanton and involved high moral culpability.

Reasonable Attorneys' fees may be awarded to a plaintiff under section 276-a of the Debtor and Creditor Law where the conveyance was made by the transferor or received by the transferee with actual intent to hinder, delay or defraud.

<u>b. Section 273 of the Debtor and Creditor Law</u>

17

To prevail under section 273 of the Debtor and Creditor Law, plaintiff must establish (a) there was a conveyance of property, (b) the transferor made the conveyance without fair consideration and (c) the transferor was insolvent when she made the conveyance or was rendered insolvent. American Inv. Bank N.A., v. Marine Midland Bank, N.A., 191 A.D.2d 690, 692 (2nd Dept. 1993). "Conveyance" includes, among other things, every payment of money, assignment or transfer of tangible or intangible property. N.Y. Debt. & Cred. Law, section 270.

Under section 271, "[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. Deb. & Cred. Law section 271(1) (McKinney 2010). Fair consideration requires that (1) the transferee of the debtor's property must convey property in exchange or discharge an antecedent debt in exchange, (2) such exchange must be a fair equivalent of the property received and (3) such exchange must be in good faith. (Debtor & Creditor Law, section 272). Transfers made without fair consideration are presumed to leave the transferor insolvent. In re. Corcoran, 246 B.R. 152, 163 (E.D.N.Y. 2000). In a case of an intra-family transfer, where the facts concerning the nature of the consideration are within the transferee's control, the transferee, rather than the plaintiff, has the burden of proving the adequacy of the consideration. U.S. Hansel, 999 F. Supp. 694 (1998).

According to the testimony of defendants, there was no fair consideration or good faith for the transfers made by Rose Ann Amato to Jack Amato. "Where

18

a transfer occurs without consideration, the defendant is presumed to have been insolvent at the time of the transfer and may only rebut the presumption by proving its continued solvency after the date of the transfer." Gaser v. Infanti, Inc., 353 F.Supp.2d at 354 (quoting In re Flutie New York, 310 B.R. 31, 53 (Bankr. S.D.N.Y. 2004)).

Defendants offered no evidence to rebut this presumption. They did not put in evidence any records showing what their assets and liabilities were in July of 2009, the month of the transfer of the stock in the Pizzeria to Jack Amato, or in June of 2008, the month of the transfer of the net proceeds of sale into a joint account at the Bank of America in the names of Rose Ann Amato and Jack Amato. The transfer of the shares of the Pizzeria by Rose Ann Amato to Jack Amato should be set aside and a money judgment entered against Jack Amato for one half of the proceeds deposited to the joint account. N.Y. Debtor & Creditor Law section 278; RTC Mortg. Trust 1995-S/N1 v. Sopher, 171 F. Supp. 2d 192 (2001).

## POINT IV.

## PLAINTIFF SHOULD BE AWARDED JUDGMENT ON HIS CLAIM OF FRAUD AND CIVIL CONSPIRACY

This Court previously held that plaintiff had pleaded valid claims of fraud and civil conspiracy and allowed these claims to proceed. Memorandum and Order of August 30, 2010, pp. 28-30. The Court also stated that plaintiff had pled a valid claim for punitive damages on these claims. Id.

The evidence demonstrated that during the period after Anna' stroke through October 2008, defendants represented to plaintiff that he should not

19

worry about Anna Perrone; that she was being well taken care of; never complained about residing in the same house with Anna Perrone; never complained about the care of Anna Perrone; never stated that they were spending money out-of-pocket to pay for babysitters or aides for Anna Perrone; never informed plaintiff that they were diverting substantial amounts of money from the reverse mortgage line of credit for their benefit; never advised plaintiff that Rose Ann Amato was repeatedly misappropriating money from Anna Perrone's checking account; never complained about a lack of funds in the name of Anna Perrone to pay for her care or about the finances of Anna Perrone except on one occasion in or about the latter part of 2005 when Rose Ann Amato stated to plaintiff that the funds of Anna Perrone were getting low at which time plaintiff took steps to investigate securing a reverse mortgage line of credit against the Premises to provide additional funds for the care and support of Anna Perrone. (Testimony of Joseph Perrone, pp. 26-73).

Rose Ann Amato represented to plaintiff that the funds from the reverse mortgage would be used for the care of Anna Perrone but instead diverted substantial amounts of those funds to her use, the use of Jack Amato and the Pizzeria.

The misrepresentations and omissions of fact by defendants were relied upon by plaintiff to his detriment and were made by defendants to intentionally mislead plaintiff and conceal the true nature of their wrongful plan to seize ownership of one hundred percent of the net proceeds of the sale of the Premises, divert amounts from the reverse mortgage line of credit to themselves

20

and deprive plaintiff of his rightful interest in the Premises. (Testimony of Joseph Perrone, pp. 39-55, 56-73).

Defendants' statements in this action that they used large amounts (in the hundreds of thousands of dollars) of their own money to pay for "babysitters" and home health aides for Anna Perrone during the period from the fall of 2004 until June of 2008 were not believable and were contradicted by the bank records and cancelled checks put in evidence.

In November 2008, Rose Ann Amato represented to plaintiff that only $80,000.00 remained from the proceeds of sale and offered to pay him one half of same. (Stipulated Fact Nos. 53-54). Thereafter, in or about late November or early December of 2008, Jack Amato stated to plaintiff that nothing from the proceeds of sale of the Premises was left providing no explanation. (Plaintiff's Exhibits 17 and 18, Paragraphs 55-59 thereof, in evidence).

Jack Amato testified that there was no discussion about protecting the Premises at the meeting he attended with Mr. Ryan, that there was no discussion about signing the Premises over to Rose Ann at the meeting, and that he never learned that the Premises were signed over to Rose Ann Amato. (Testimony of Jack Amato, pp. 369-370).

Despite his denials, Jack Amato knew of the Agreement at the time it was entered into, actively participated in the meeting with John Ryan, Esq. and in a prior meeting with another lawyer concerning the transfer of the Premises together with an agreement to divide the proceeds equally between plaintiff and Rose Ann Amato. Jack Amato was actively involved in all decisions regarding

21

the Premises.  Testimony of Joseph Perrone, pp. 72-73; Testimony of John E. Ryan, Esq., pp. 401-407; Plaintiff's Exhibits 17 and 18 in evidence, Para. 31 thereof.  Later in his trial testimony, Jack Amato said that he knew that when the Premises were sold that plaintiff was to receive one half of the proceeds. (Testimony of Jack Amato, pp, 386-387).

Jack Amato testified that he hired the contractors who did the work on the build-out of the restaurant space leased by the Pizzeria.  Yet he denied knowledge of the source of funds used to pay these contractors.  He denied any knowledge that funds from the reverse mortgage were used to pay the mortgage and homeowners' dues on his home in Florida.  (Testimony of Jack Amato, pp. 371-372); Plaintiff's Exhs. 43-51 in evidence; Rose Ann Amato, pp. 270-280).

The falsity of defendants' representations is made evident by simple math. During the period from October 2004 through October of 2008 Anna  had annual income of $28,716.00.  In addition, Anna had cash assets of at least $30,000 at the time of her stroke.  The proceeds of the reverse mortgage from April 2006 through June 2008 totaled approximately $235,000.    Anna also should have received $24,000 in rental income from Rose Ann and Jack Amato from June 1 2004 to June 30, 2006 as well as rental income from their son who continued to reside in the Premises until June 2008.  She received none.  The  home health aides did not begin until the end of October of 2005 and any babysitters were paid from the assets of Anna Perrone.

From October of 2005 to October of 2008, Anna's combined actual cash income,  cash  assets  and  cash  proceeds  of  the  reverse  mortgage  totaled

approximately $377,704.00. This comes to an annualized cash flow of $125,901 during the three year period from October of 2005 to October of 2008. From the end of May 2007 to October 2008, Anna resided in facilities in Florida paid from the reverse mortgage. Rose Ann Amato has admitted that the monthly cost of Nature's Edge (approximately $2,880) and monthly cost of the Palms ($3,372) were paid from the reverse mortgage monthly draws and that she paid none of those costs personally. (Testimony, Rose Ann Amato, pp. 232-35, Checks to Nature's Edge included in Plaintiff's Exhibits 34-D and 15). There were no home health aides providing 24 care during this period. The evidence justifies an award of punitive damages against defendants.

## POINT V.

## JACK AMATO TORTIOUSLY INTERFERED WITH THE AGREEMENT

This Court has found that a valid contract existed between plaintiff and Rose Ann Amato, that Rose Ann Amato actually breached the contract and that plaintiff sustained damages as a result of that breach. Order dated January 12, 2012. Plaintiff testified that all decisions concerning the care of his mother, the Premises, the transfer thereof and the Agreement were made with the knowledge and input of Jack Amato. (Perrone testimony, pp. 43-44).

Jack Amato had knowledge of the Agreement; the plan to protect the Premises and the transfer of the same to Rose Ann Amato. (Ryan Testimony, pp. 401-407; Admission contained in handwritten pro se answer of Jack Amato dated March 30, 2010, Para. 31 of Plaintiff's Ex. 18 in evidence; Plaintiff's Exh.

17 in evidence; testimony of Jack Amato, pp. 377-378; Perrone testimony, pp.
72-73).

Jack Amato testified that he was in charge of the build-out of the Pizzeria,
hired the contractors and stated the Pizzeria was his business. He then denied
any knowledge that the source of funds used to pay contractors and to pay rent
to the landlord of the Pizzeria was the reverse mortgage. Jack Amato testified
that Amichi was his company and that he only transferred the shares to his wife
because of his felony conviction in order to deceive the New York State Liquor
Authority. He and his wife signed and filed a sham separation agreement to
deceive the New York State Liquor Authority. (Testimony, Jack Amato, pp. 354-
358).

Jack Amato reaped the benefits of the breach of the Agreement and knew
that when the Premises were sold that plaintiff was to receive one-half of the
proceeds of sale. (Testimony, Jack Amato, pp 386-87). Incredibly, he then
testified that he never asked his wife if she had paid plaintiff one-half of the
proceeds of sale even after she deposited net proceeds in the sum of $269,000
to their joint account at the Bank of America. (Testimony of Jack Amato, pp. 386-
87). His pro se answer to the first amended complaint (Exhibits 17 and 18,
paras. 31, 55-59) shows that he was aware of all the relevant events as they
occurred. Jack Amato lied about his knowledge of the Agreement and his
procurement of its breach by Rose Ann to insulate himself from liability.
Damages in the amount of $171,466.74 should be awarded against Jack Amato.
See Point I for calculation.

24

## POINT VI.

### THE SECOND AMENDED ANSWER CONTAINS NO COUNTERCLAIM OR AFFIRMATIVE DEFENSE OF PAYMENT

A defendant must set forth affirmatively in his answer any matter constituting an avoidance or affirmative defense. Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33 (2d Cir. 2009) (Irrespective of whether a setoff claim is characterized as an affirmative defense or a compulsory or permissive counterclaim, it must be set forth in the pleadings to provide a basis for relief). In Arch, the Court found that the sureties' claim/defense of setoff was abandoned. In her original answer and first amended answer Rose Ann Amato alleged a counterclaim against plaintiff. This counterclaim was omitted in its entirety from defendants' second amended answer to the second amended complaint.

### CONCLUSION

Plaintiff requests the Court award him judgment against defendants on his claims, together with punitive damages in an amount of at least $100,000.00, interest from June 23, 2008, and attorneys' fees on his fraudulent conveyance claim under section 276-a of the Debtor and Creditor Law.

Dated:  June 21, 2012

Respectfully submitted,

/s/ Donald H. Hazelton
Donald H. Hazelton, Esq.
Donald H. Hazelton, P.C.
Attorney for Plaintiff
DHH7876
245 Hillside Avenue
Williston Park, New York 11596
Telephone: (516) 742-7200
hazeltondonald@aol.com

25