**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
JOSEPH PERRONE,

Plaintiff,

-against-

ROSE ANN AMATO and JACK AMATO,

Defendants.
-------------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**

CV 09-316 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

## I.    PRELIMINARY STATEMENT

This case arises in the context of the deterioration of a family relationship.  Plaintiff Joseph Perrone ("Plaintiff") brings this action against Defendants Rose Ann Amato (or "Rose Ann") and Jack Amato (or "Jack") (collectively, "Defendants") asserting claims for breach of contract, fraudulent conveyance pursuant to the New York Debtor and Creditor Law ("DCL") §§ 273 and 276, conspiracy, fraud, constructive trust, and tortious interference.  *See generally,* Second Amended Complaint ("SAC") [DE 80].  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, and the parties have consented to this Court's jurisdiction for all purposes in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  *See* DE 114.

The Court conducted a bench trial which lasted three days, *see* DE 120-22, and hereby issues the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  In reaching these findings and conclusions, the Court heard the testimony and observed the demeanor of the witnesses, viewed and assessed the evidence adduced by each side, and considered the arguments and submissions of counsel.  Only those facts the Court deems necessary for the resolution of the claims are discussed here.  For the

reasons set forth below, the Court finds that Plaintiff has proven his claims for breach of contract, violations of DCL § 276, fraud, and conspiracy.  Plaintiff has not proven his claims for violations of DCL § 273 or tortious interference and those claims are dismissed.  Further, Plaintiff's requests for the imposition of a constructive trust and for punitive damages are denied.  However, Plaintiff's request for attorney's fees under DCL § 276 is granted.

## II.  FINDINGS OF FACT

The Court incorporates the parties' Stipulated Facts as set forth in the parties' Joint Pre-Trial Order ("JPTO" [DE 91]) as findings of the Court.  Additional findings of fact are made based on the testimony and evidence presented at trial.[1]  Disputed facts are addressed and resolved in Section II(C), *infra.*

### A.  Factual Background

This case presents the unfortunate circumstance of a family divided.  Anna Perrone had two children, namely, Plaintiff Joseph Perrone and Defendant Rose Ann Amato.  *See* JPTO, Stipulated Facts 1, 3.[2]  Sometime in the 1980s, Anna Perrone purchased a residence at 632 Jefferson Street, West Hempstead, New York (the "Premises").  SF 5, 6.  Defendants Rose Ann and Jack Amato and their children moved to the Premises in the early 1990s.  SF 7.  Initially, Defendants paid rent to Anna Perrone of approximately $1,000 per month.  SF 8.  At that time,

---

[1]  Plaintiffs provided a bench book of the Exhibits on which the parties had agreed and which were deemed in evidence.  *See* Transcript of the Trial dated May 7, 2012 at 11, 14.  All subsequent references to the trial transcript are designated "Tr. ___."

[2]  All of the Stipulated Facts referenced here are contained in the JPTO and are referred to hereafter by the designation "SF __" followed by the actual numbered fact.

Defendants[3] owned a restaurant, "Amici's," which had first opened in 1983 or 1984. Tr. 199.

On May 20, 2003, Anna Perrone executed a durable general power of attorney ("Power of Attorney"). *See* Tr. 94-96; 398-399; Pl.'s Ex. 6 (May 20, 2003 Power of Attorney for Anna Perrone). The Power of Attorney was prepared by attorney John Ryan, Esq. ("Attorney Ryan"). Tr. 398. The Power of Attorney named both of Anna's children, Joseph Perrone and Rose Ann Amato, as attorneys-in-fact and agents of Anna Perrone. *See* Ex. 6.

On May 8, 2004, Anna Perrone suffered a massive stroke. SF 2. At that time, Anna owned the Premises free of any liens. SF 23. Defendants were living in the Premises at that point, but ceased making monthly rental payments thereafter. SF 8. During the period running from May 28, 2004 through the fall of 2004, Anna Perrone was hospitalized in New York and then was placed in a rehabilitation facility. SF 4. After that, in approximately October 2004, Anna Perrone returned to the Premises, where Rose Ann and Jack Amato also continued to reside with their son. Tr. 26, 200.

Anna Perrone's stroke left her unable to speak, sign checks, pay bills, use credit cards, or care for her daily needs. SF 2; Tr. 302. She could not talk, use the bathroom by herself, clean herself or cook, and she sometimes wet the bed and had episodes of hyperactivity. Tr. 97-99. After the stroke, Anna Perrone required daily physical care. Tr. 200. She also required someone to manage her finances. Tr. 308. In general, after the stroke, Rose Ann managed Anna Perrone's finances. *Id.* However, the parties dispute who was primarily responsible for providing Anna Perrone with physical care, and whether or not Anna Perrone's

---

[3]  As discussed below, Jack Amato initially owned Amici's, but transferred the restaurant to his wife, Rose Ann. Jack Amato had a criminal conviction which precluded him from obtaining a liquor license for the restaurant and so the business was placed in Rose Ann's name. Tr. 293-294; 355-356.

finances/resources covered the costs of this care, as outlined in detail below.  *See* Section II(C), *infra*.

After Anna Perrone's stroke, Defendants approached Plaintiff to advise him that they wished to seek out options to legally protect the Premises in the event that Anna Perrone would need nursing home care.  SF 11.  Plaintiff and Defendants attended a meeting with Attorney Ryan to obtain legal guidance about protecting the Premises.  SF 12.   As a result of that meeting, title to the Premises was deeded by Anna Perrone, as grantor, to Rose Ann Amato, as grantee, on February 8, 2005, pursuant to a deed prepared by Attorney Ryan.  SF 16, 20; Pl.'s Ex. 2 (the "Deed").  The Deed was signed on behalf of Anna Perrone by Plaintiff Joseph Perrone as attorney-in-fact of Anna Perrone under the Durable Power of Attorney.  SF 16, 20; Pl.'s Ex. 2.  Under the terms of the Deed, Anna Perrone retained a life estate in the Premises.  SF 16; Pl.'s Ex. 2.

Later that same day, Plaintiff Joseph Perrone and Defendant Rose Ann Amato attended a meeting with Attorney Ryan at his law office.  SF 17.  There, Joseph and Rose Ann  signed a written agreement regarding the Premises.  SF 18; Pl.'s Ex. 1 (the "Agreement").  The Agreement provided that at Anna Perrone's death or upon the sale of the Premises, whichever occurred first, Rose Ann Amato would give Joseph Perrone a one-half interest in the Premises, or pay Joseph Perrone the monetary equivalent after the sale.  Pl.'s Ex. 1.  Rose Ann Amato voluntarily signed the Agreement.  SF 19.  As outlined below, the parties dispute whether Jack Amato was present during the meeting with Attorney Ryan at his law office on February 8, 2005 and whether Jack Amato had knowledge of the Agreement providing Joseph Perrone with a one-half interest in the Premises.  *See* Section II(C), *infra*.

In June or July of 2005, Defendants sold Amici's. Tr. 209. Shortly thereafter, in or about August 2005, a convenience account was established in the name of Defendant Rose Ann Amato and Plaintiff Joseph Perrone at HSBC Bank in New York ("HSBC Acct. 8600"). SF 26. This HSBC Bank account was established for the benefit of Anna Perrone and was funded with the assets of Anna Perrone. SF 27.

Around October 2005, home health aides from an agency called "Aging at Home" began providing in-home care for Anna Perrone. Tr. 231. In late 2005 or early 2006, Rose Ann advised her brother Joseph that their mother Anna's money was running low. SF 21. In order to provide Anna Perrone with additional income, a reverse mortgage line of credit was obtained through Bank of America for the Premises on or about April 29, 2006 ("BOA Loan #0443"). *See* SF 22, 31, 40. The reverse mortgage line of credit created a first mortgage lien on the Premises and was executed by Rose Ann Amato and Anna Perrone (who held a life estate) as mortgagors. SF 23, 24. As monthly advances were made by Bank of America on the reverse mortgage, the mortgage lien on the Premises increased. SF 25.

On April 20, 2006, initial funds from the reverse mortgage line of credit in the amount of $24,485.00 were deposited in HSBC to an account in the name of Anna Perrone ("HSBC Acct. 4874"). SF 28; Pl.'s Ex. 10 (HSBC Acct. 4874 Checks 4447, 4448). Subsequent funds received from the reverse mortgage line of credit were deposited to HSBC Acct. 8600 in the name of Rose Ann Amato and Joseph Perrone during the period running from May 1, 2006 to March 1, 2008. SF 29. Initially, Joseph Perrone and Rose Ann Amato agreed that monthly deposits of $4,500 would be deposited into this joint account, HSBC Acct. 8600, from the reverse mortgage line of

credit.  Tr. 50, 243.  For some period of time, Seattle Mortgage was a loan servicer on the reverse mortgage line of credit.  SF 30.

On September 5, 2006, Defendant Rose Ann Amato signed Anna Perrone's name to a line of credit draw down and requested, in the name of Anna Perrone, a $10,000 draw down on the reverse mortgage line of credit.  SF 32.  Further, Rose Ann Amato signed Anna Perrone's name to a September 18, 2006 letter to Seattle Mortgage, requesting an increase in monthly payments under the reverse mortgage line of credit from $4,500 to $6,000.  SF 33, 34; Pl.'s Ex. 12 (Sept. 18, 2006 letter to Seattle Mortgage).  This increase was approved by Seattle Mortgage. Tr. 263.  Plaintiff did not recall ever being advised by his sister that this increase had been requested and approved, nor did he authorize such an increase.  Tr. 52-53.  Rose Ann Amato testified that she informed Plaintiff about the increase and that the additional funds were necessary for the care of Anna Perrone.  Tr. 268.  These disputed facts are addressed in Section II(C), *infra.*

In June 2006, Defendants Rose Ann Amato and Jack Amato moved from New York after purchasing a home in Port St. Lucie, Florida.  Tr. 246.  Anna Perrone remained living at the Premises under the care of the home health aides from Aging at Home.  Tr. 232.  Rose Ann would return to the Premises from Florida approximately once every two or three weeks, and she continued to manage the finances of Anna Perrone.  Tr. 336-337.

Eventually, in May of 2007, Defendants moved Anna Perrone to Florida, where she began residing at an assisted living facility, "Nature's Edge."  SF 35.  After three months at Nature's Edge, Anna Perrone was moved to a different assisted living facility in Florida, namely, "The Palms."  Tr. 232-233.

In July 2007, the restaurant "Jack's Pizzeria, Inc." was incorporated in the state of Florida. SF 56; Tr. 251; 343-344; 354. The sole shareholder and director of Jack's Pizzeria, Inc. during its existence in calendar years 2007 and 2008 was Rose Ann Amato. SF 57-58; Tr. 251-252. Defendants claim that Jack Amato operated and managed Jack's Pizzeria and that Rose Ann served only nominally as the sole director. Tr. 293-294; 361-362. Defendants maintain that Jack could not serve as shareholder and director because a prior criminal conviction prevented him from obtaining the liquor license necessary for the business. Tr. 344-345, 361-362. Plaintiff does not appear to dispute Defendants' assertion that Jack operated Jack's Pizzeria or that Jack was previously criminally convicted. Sometime after the purchase, Defendants undertook a renovation or "build-out" of Jack's Pizzeria. Tr. 251;270; 362.

On or about October 9, 2007, Defendant Rose Ann Amato increased the monthly draw down on the reverse mortgage line of credit from $6,000 per month to $9,000 per month by signing Anna Perrone's name to a Bank of America "Change of Payment Request Form" dated October 9, 2007. SF 37; Tr. 177-179, 269-270; Pl.'s Ex. 6 at 10. Plaintiff maintains that this increase was requested without his knowledge or consent. Tr. 58-59. Rose Ann Amato asserts that she informed Plaintiff about the increase and that the additional funds were necessary for the care of Anna Perrone. Tr. 280-281.

In March of 2008, Rose Ann Amato opened a Bank of America account in her name and the name of Anna Perrone. SF 38; Tr. 275-277; Pl.'s Ex. 15 ("BOA Acct. 6618"). Along with her March 26, 2008 sworn affidavit, Rose Ann Amato provided the Bank of America with a copy of the Durable General Power of Attorney of Anna Perrone dated May 20, 2003. SF 39. Rose

Ann directed Bank of America, in a letter dated March 24, 2008, to wire the $9,000 monthly funds from the reverse mortgage line of credit directly into BOA Acct. 6618. SF 40.

The Premises in New York was sold on June 23, 2008.[4]  SF 42.  Rose Ann Amato and her attorney, Henry Worokomski, Esq., handled the sale.  Tr. 281, 282, 334-335; Pl.'s Ex. 7 (Closing Statement for the Premises).  Plaintiff was not present at the closing because he was hospitalized at the time.  Tr. 281.  The purchase price for the premises was $537,500.  SF 43.  At the time of the closing on the sale, the balance due to Bank of America on the reverse mortgage line of credit was $235,850.94, which was paid at the closing.  SF 44,45.  After taxes, liens, expenses, and an escrow in the amount of $2,500, the proceeds of the sale of the Premises amounted to $267,032.04.[5]  SF 46; Tr. 174, 281.  Defendant Rose Ann Amato deposited these proceeds into a joint bank account she held with Jack Amato at the Bank of America in Florida. SF 47; Tr. 282-283.  Rose Ann Amato subsequently received the $2,500 escrow payment from Attorney Worokomski.  SF 49; Tr. 282.  The total net proceeds received by Rose Ann Amato from the Sale of the Premises, therefore, was $269,532.04.  *Id.*  Plaintiff's interest in one half of the net proceeds from the sale of the Premises amounted to $134,766.02, including his one-half share of the returned escrow.  SF 50.

On October 24, 2008, Anna Perrone passed away.  SF 51; Tr. 247, 376.  In the Fall of 2008, Plaintiff and Rose Ann had a telephone conversation regarding the proceeds from the sale of the Premises.  SF 53; Tr. 283.  At that time, Rose Ann told Plaintiff that before she could

---

[4]  The stipulated fact referenced here reads, "[t]he closing of sale of the Premises took place in New York State on 23, 2008."  Based on the pleadings, motions, and evidence in this case, the parties' omission of the word "June" in this sentence seems to be a typo, since this date does not appear to be disputed.

[5]  It appears that the parties incorrectly asserted in their Joint Pre-Trial Order that this amount was $267,032.40, rather than $267,032.04.  Based on a review of the evidence, it appears that that the correct amount received by Rose Ann at this time was $267,032.04.

remit his share, she had to speak to her accountant regarding certain tax issues. SF 53; Tr. 283-284. In a subsequent telephone conversation that Fall, Rose Ann told the Plaintiff that only $80,000 of the $267,000 proceeds remained. SF 54; Tr. 284. Rose Ann offered to pay Plaintiff one-half of the purported $80,000 that remained, or $40,000. SF 55; Tr. 284.

Plaintiff commenced this action on January 26, 2009 against Defendant Rose Ann Amato alleging breach of contract and seeking the imposition of a constructive trust. *See* Compl., DE 1. Approximately six months later, in July 2009, Rose Ann Amato transferred 90% of her shares of capital stock in Jack's Pizzeria to Defendant Jack Amato. Tr. 251-252. After the transfer, Jack Amato owned 90% of the shares, while Rose Ann owned 10%. *Id.* None of the proceeds of the sale of the Premises have ever been paid to Joseph Perrone. SF 52; Tr. 285.

### B. Procedural History

Once the Complaint was filed, the Court set the Initial Conference date and the parties commenced the discovery process. On February 12, 2010, pursuant to stipulation, Plaintiff amended the Complaint to include Jack Amato and Jack's Pizzeria, Inc. as defendants and added claims for promissory estoppel, fraudulent conveyance pursuant to Sections 276 and 274 of the Debtor and Creditor Law, breach of fiduciary duty, conspiracy, fraud, and tortious interference. DE 22.

Defendants Jack Amato and Jack's Pizzeria moved to dismiss the Amended Complaint. DE 57, 66. On August 30, 2010, Judge Platt granted the motion by corporate defendant Jack's Pizzeria to dismiss the Amended Complaint based on lack of subject matter jurisdiction. [DE 78] at 6-15. As to individual defendant Jack Amato, Judge Platt granted the motion, in part, and

denied it in part, allowing the claims for breach of contract, [6] fraudulent conveyance, conspiracy, fraud, constructive trust (with respect to any funds unrelated to Plaintiff's breach of contract claim) and tortious interference to proceed. DE 78 at 18-39. However, he dismissed Plaintiff's claims for promissory estoppel and breach of fiduciary duty, as well as Plaintiff's request for the imposition of a constructive trust on funds related to Plaintiff's breach of contract claim. *Id.*

On September 17, 2010, Plaintiff filed the Second Amended Complaint to reflect Judge Platt's rulings on the motions to dismiss. DE 80. Mark Goidell, Esq. was substituted in as counsel for Defendants Roseann Amato and Jack Amato on March 31, 2011. DE 84. Defendants interposed an Answer on December 29, 2010.[7] DE 83. After some further discovery, Plaintiff's counsel filed a Motion for Partial Summary Judgment on the breach of contract claim against Defendant Rose Ann Amato on September 6, 2011. DE 93. That motion was granted on January 12, 2012. DE 111. Specifically, Judge Platt held that no genuine issue of material fact existed with respect to Plaintiff's breach of contract claim and that Plaintiff was entitled to one-half of the net proceeds from the sale of the Premises, plus interest. *Id.* at 13. Judge Platt also noted that the question of any additional funds owed to Plaintiff were issues of fact that needed to be proven at trial or jointly settled upon by the parties. *Id.* at 13 n.5.

On March 13, 2012, the parties consented to the jurisdiction of this Court for all purposes, in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. DE 114. Counsel had previously submitted their proposed Joint Pre-Trial Order on July 22, 2011. DE 91. At a

---

[6] Judge Platt noted that while the breach of contract claim was alleged against all Defendants, it applied only to Defendant Rose Ann Amato. *Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) [DE 78] at 20 n. 4.

[7] The Answer was apparently served on the Plaintiff on December 29, 2010 but was not filed on ECF until March 31, 2011.

conference held on March 30, 2012 [DE 116], the Court set this matter down for trial on May 7, 2012. Counsel were directed to file their respective Trial Memoranda [DE 117, 119] one week prior to trial and a schedule was set for motions *in limine*. DE 116.

A bench trial was held over three days on May 7, 8 and 12, 2012. *See* DE 120-22. The Plaintiff was represented at trial by attorneys Michael Marcellino, Esq. and Alexander Sansone, Esq.[8] *See id.* Attorney Mark Goidell, Esq., represented the Defendants. *Id.* At trial, the Court heard testimony from Plaintiff and Defendants, as well as Attorney John Ryan. *Id.* A binder of exhibits which the parties had agreed in advance would be deemed "in evidence" was also introduced. At the conclusion of the trial, Defendants moved for judgment as a matter of law. Tr. 418-434. The Court reserved decision and sent to schedule post-trial briefs. Tr. 434-441.

On June 21, 2012, Plaintiff's attorney filed his post-trial brief. DE 124. On July 10, Attorney Goidell filed a Motion to Withdraw as Attorney for Defendant Jack Amato. DE 124. The Court subsequently received a letter from Jack Amato dated July 6, 2012, requesting the dismissal of Attorney Goidell, as to Jack Amato only. DE 125. Shortly thereafter, on July 12, 2012, the Court received another letter from Defendant Jack Amato entitled "Explanation with facts." DE 126. Jack Amato asked the Court to dismiss the claims against him, and included a page entitled "Revised version of income & expenses for Anna Perrone" which appeared to be an itemization of Anna Perrone's alleged income and expenses from the time of her stroke to the time of her death. *Id.*

The Court held a Telephone Conference on July 16, 2012 to discuss Attorney Goidell's motion to withdraw as counsel for Jack Amato. DE 127. Having heard the positions of both Attorney Goidell and Defendant Jack Amato, and with Jack Amato's consent, the Court granted

---

[8] Plaintiff is also represented by attorney Donald Hazelton, Esq.

Attorney Goidell's motion to be relieved as counsel for Jack Amato.  *Id.*  Further, at the request

of Defendant Jack Amato, who was then proceeding *pro se,* the Court agreed to accept the five-

page submission entitled "Explanation with facts" as Defendant Jack Amato's post-trial brief.

*Id.*  Attorney Goidell filed a separate post-trial brief on behalf of Rose Ann Amato.  DE 128.

### C.    Analysis of the Parties' Factual Disputes

Despite the number of Stipulated Facts in the record, the parties dispute several key

issues.  In order to resolve Plaintiff's remaining claims, certain factual findings must be made

with regard to these disputes in light of the testimony and the documents in evidence at trial.

The Court examines each of these disputed issues in turn.

### 1.    *Defendants' Claim that Funds From the Sale of the Premises and the Increases in the Reverse Mortgage Were Necessary for the Care of Anna Perrone*

In general, Defendants argue that funds from the sale of the Premises and funds obtained

from the reverse mortgage line of credit on the Premises were used for the care of Anna Perrone

and not for Defendants' own benefit.  *See* Pre-Trial Memorandum of Defendants Jack and Rose

Ann Amato ("Defs.' Pre-Trial Mem.") [DE 119] at 6-7.  Defendants assert that Anna Perrone's

personal resources, eventually including the funds from the reverse mortgage line of credit, were

not enough to pay for her care.  *Id.*  Therefore, Defendants maintain, they were forced to expend

their own personal resources for the care of Anna Perrone.  *Id.*  Further, and as discussed in

Section II(C)(2), *infra*, Defendants contend that they were forced to increase Anna Perrone's

monthly income from the reverse mortgage line of credit.  They also claim that Plaintiff

consented to these increases and to the use of those funds, as well as the funds from the Sale of

the Premises, for the continuing care of Anna Perrone, and for reimbursements to Defendants for that care.[9] *Id.*

In contrast, Plaintiff maintains that Anna Perrone's resources were sufficient to provide for her care and that Defendants used the funds from the sale of the Premises and the reverse mortgage line of credit for their own personal benefit and for the benefit of Jack's Pizzeria. Post-Trial Memorandum of Law of Plaintiff Joseph Perrone ("Pl.'s Post-Trial Mem.") [DE 123] at 8-13. Plaintiff argues that he never consented to nor was he aware of the increases on the reverse mortgage line of credit above the initial agreed-upon monthly sum of $4,500. Tr. 52-53.

At the time of her stroke, Anna Perrone held an HSBC Bank account in her own name (HSBC Acct. 4874) where funds from social security, workers compensation, and her Local 1199 retirement/pension were deposited. *See* Tr. 88-90; 207-208; 290; Ex. 19A (Copies of checks 1589-1709 made out to cash, to various individuals, and to certain entities from Anna Perrone HSBC Acct. 4874). Anna Perrone's income from these sources averaged approximately $2,265 per month. *See* Tr. 89-90, 207-209; Ex. 19 (Composite exhibit of bank statements and checks made out to various individuals, entities and cash, from Anna Perrone HSBC Acct. 4874.[10] Further, it appears undisputed that Anna Perrone had approximately $30,000 in other

---

[9] With respect to the proceeds from the sale of the Premises, Defendants maintain that Plaintiff agreed to an oral modification of the Agreement allowing Rose Ann to reimburse herself the costs of Anna Perrone's care from those funds. As discussed below, Judge Platt had already rejected Defendants' argument regarding the purported oral modification. However, since this argument is relevant to Plaintiff's other claims, the Court must still examine it.

[10] Plaintiff testified while reviewing checks issued to Anna Perrone's bank account in late 2003 (Ex. 19) that Anna Perrone's monthly income consisted of earned $523 for pension (Tr. 89:10-14); $1,102 for social security (Tr. 89:18-23) and $640 for worker's compensation (Tr. 90:2-21). Anna Perrone's monthly income therefore averaged approximately $2,265 per month. Plaintiff further testified that these payments may have gone up moderately until the time of Anna Perrone's death. Tr. 89-90. Defendant Rose Ann Amato confirmed during her testimony that Anna Perrone's income averaged in excess of $2,250 per month, and went up

funds (money market, mutual fund, account with Metropolitan Life, etc.) at the time of her stroke. Tr. 79-80, 206-207. As noted, Defendants claim that these funds were not sufficient to cover Anna Perrone's monthly expenses. However, Defendants introduced little evidence of payments made on Anna Perrone's behalf which would have exceeded her monthly income. In general, Defendants' testimony with respect to these expenses is contradictory and unsupported.

Rose Ann Amato first testified that she had no one to help her care for her mother when Anna Perrone first came home from the hospital.[11] According to Rose Ann, "[n]obody helped me out. I had – when she first came home I had the Medicare. That's it." Tr. 202. These individuals came in for four hours a day for a two week period. Tr. 202, 203. After this initial period, Rose Ann testified that she had additional help with her mother -- women whom Jack Amato found through Amici's. Tr. 203-204, 304. According to Rose Ann, these aides were present 18 hours a day and were paid an average of $15 per hour:

Q. During the period of time for the year, how often were aides in the house?

A. They were there 18 hours a day.

Q. And how were they paid?

A. How were they paid? Cash, check, from all the accounts.

---

slightly due to moderate increases over the years. Tr. 209:2-11. Further, although Anna Perrone also received monthly rental payments from Defendants, Defendants discontinued these payments after Anna Perrone suffered a stroke. SF 9. Therefore, Anna Perrone's income subsequent to her stroke in May 2004 but before receiving the additional monthly income from the reverse mortgage in April 2006 was approximately $2,265 per month.

[11] It appears undisputed that aides were paid while Anna Perrone was hospitalized. *See* Tr. 180-183; Ex. 19E (including a series of 10 checks for $108 and one check for $174 paid to hospital aides from the period June 11, 2004 to July 7, 2004). Rose Ann estimated in her post-trial brief that aides for the period were paid $108 for 110 days for a total of $11,880 for the period Anna Perrone was hospitalized. However, only 10 checks for these aides were identified during the trial. *Id.*

Q.     Okay.   When you say from all of the accounts, we're talking about from Mom's account?

A.     Could have been Mom's, could have been mine, could have been cash.

Q.     You had a checking account at the time?

A.     Me?  Yes, sure.

Q.     Do you have any documentation to confirm that you made payments to aides out of your checking account?

A.     I have no records.

Q.     And that would be true across the board, you have no records of anything?

A.     I have no records.

Q.     And that would be true for the payments to aides in New York and payments to anybody – aides in Florida.  Fair statement?

A.     No, I paid them cash.

Tr. 224-225.  Later, however, Rose Ann testified that these aides were present "every day" for 24 hours a day.  Tr. 324-325.  In contrast, Plaintiff contends that Rose Ann was her mother's primary caretaker for approximately the first year after Anna Perrone returned home from the hospital, but that Rose Ann would occasionally hire outside aides to provide herself with a break.  Tr. 27-29.

Rose Ann also testified that at the time her mother suffered the stroke on May 28, 2004, Rose Ann herself had various medical conditions, including arthritis in her knees and a heart arrhythmia.  Tr. 295.  Other than their own testimony, Defendants did not provide any medical records regarding those conditions.  Further, Defendants introduced no documentary evidence (*e.g.*, any sign in or sign out sheet or any receipt for the pay the aides received) showing that home health aides were, in fact, present for 18 (or 24) hours each day or compensated in an

amount which would exceed Anna Perrone's monthly expenses.  No home health aide was called

to testify on Defendants' behalf that he or she provided care to Anna Perrone during this (or any

other) period.  Rose Ann acknowledged that from October 2004 until October 2005, Anna

Perrone's care was being provided by her, along with some aides.  Tr. 224.  It was not until

October 2005 that the Defendants hired the Aging at Home agency to provide in-home assistance

for Anna Perrone.  Tr. 224-226, 231; Ex. 20 (Aging at Home Records). Therefore, the Court is

left to conclude that Anna Perrone's primary caretaker during this period of time was likely Rose

Ann, and that, in any case, Anna Perrone's expenses did not exceed her income from the time

she had her stroke until October 2005, when Aging at Home was hired.

Plaintiff testified that it was his understanding that Aging at Home would provide his

mother with 24-hour care.  Tr. 45.  Plaintiff estimated that the fee for Aging at Home was

approximately $1,200 per week.  *Id*.  It is unclear how Plaintiff arrived at this figure.  He testified

that "looking back and going through records, it was about twelve hundred a week."  Tr. 45.

Rose Ann testified that initially, the aides from Aging at Home were paid $12 an hour.  Tr. 325.

That changed at some point because the aides wanted more money, according to Rose Ann, and

she agreed to pay them more money -- in cash. *Id.*   These aides worked 24 hours per day at a

rate of $20 per hour, and sometimes more.  Tr. 325-326, 338-339.  At that rate, the fees for

Aging at Home aides would have totaled approximately $3,360 *per week*, or $13,440 per month.

Rose Ann testified that in addition the monies paid to the home health aides, she also paid an

agency fee.  Tr. 231-232.

Even assuming Plaintiff's more conservative estimate that total payments for agency and

in-home aide fees averaged approximately $1,200 per week (or about $4,800 per month), these

fees exceeded Anna Perrone's income of approximately $2,265 per month. Therefore, for the six-month period from October 2005 to April 2006 (when the reverse mortgage line of credit was taken out), Anna Perrone's expenses almost certainly exceeded her income. Defendants' counsel pointed out that even before Anna Perrone's stroke, it appears that she sometimes incurred fees for insufficient funds in her bank account. *See* Tr. 82-84; Ex. 19, 19E and 19F (HSBC Bank statements for Acct. 4874). Further, while Anna Perrone's assets may have been initially used to cover this short-fall, the record is not clear on this point. Rose Ann testified that from October 2005 to April 2006, when the reverse mortgage line of credit was obtained, and while Anna Perrone was receiving care from Aging at Home, Defendants expended additional funds for this care, and to meet Anna Perrone's other needs (*i.e.* diapers, plastic bedding, cleaning supplies, food – for Anna and the aides -- and hygienic supplies). Tr. 332-333.

However, in April 2006, six months after Aging at Home began providing Anna Perrone with services, Plaintiff and Rose Ann took out the reverse mortgage line of credit, increasing Anna Perrone's monthly income by $4,500 per month, for a total monthly income of approximately $6,765 per month. *See* Tr. 241, 243. It is undisputed that the line of credit was initially opened because Rose Ann represented that Anna Perrone's money was running low. Tr. 46-47, 241. While Anna Perrone resided in New York, monthly income from the reverse mortgage line of credit was deposited into the joint account of Plaintiff Joseph Perrone and Defendant Rose Ann at HSBC (HSBC Acct. 8600). Assuming Plaintiff's estimate of $1,200 per week (or approximately $4,800 per month) for agency fees and aides during this period, Anna Perrone's monthly income (including the funds from the reverse mortgage) covered expenses for in-home care. On the other hand, assuming Rose Ann Amato's figure of $13,440 paid to Aging

at Home aides per month, not including additional agency fees, Anna Perrone's personal income did not cover these expenses, even including the additional $4,500 in monthly income from the reverse mortgage line of credit.

The Court finds that Rose Ann Amato's testimony with respect to cash payments to the Aging at Home aides is not credible. In the first instance, Defendants submit limited documentary evidence to support these payments. During the trial, Rose Ann reviewed a number of checks paid from both the account of Anna Perrone (HSBC Acct. 4874) and the joint account of Rose Ann and Joseph Perrone (HSBC Acct. 8600), purportedly for Aging at Home aides during the time period from October 5, 2005, to May 2007, to support their contention that these fees (along with additional living expenses, discussed below) exceeded Anna Perrone's income. *See* Ex. 19A; Ex. 19D; Ex. 34E. Some of these checks are written directly to the Aging at Home aides. *See* Tr. 236-239. However, there is no evidence that these payments amounted to anything near the $3,360 per week asserted. For example, Rose Ann was able to identify several checks during the month of March 2006 written directly to Aging at Home aides. *See, e.g.,* Tr. 236-239; Ex. 19D (check dated March 23, 2006, for $500, endorsed by Lydia Alumano (#1731); check dated March 17, 2006, for $500, endorsed by Lydia Alumano (check #1728); check dated March 27, 2006, for $200, endorsed by Esperanza Annunziato (check #1732); check dated March 12, 2006, for $200, endorsed by "Rhodora" (check #1724)). However, the total amount paid out to aides in March 2006 according to these checks was only $1,400.

Further, while the above-referenced checks were made out directly to the Aging at Home aides, the majority of checks from Anna Perrone's account and the account where the reverse mortgage funds were deposited were made out to "cash" and endorsed by Rose Ann Amato

18

herself (or in the case of the account of Anna Perrone, by Rose Ann Amato for Anna Perrone).
*See* Tr. 256-259; Ex. 34E; Ex. 19A; Ex. 19D (for example, checks #1735 ($600), #1736 ($200), #1739 ($700), #1748 ($500); #1747 ($300); #1745 ($300); #1750 ($800); #1754 ($350); #1753 ($100)). While some of these include "for" designations which may relate to a home health aide (for example, check #1733 is noted as "for" Lydia but is endorsed purportedly by Anna Perrone), many of these checks do not include a "for" designation. *See generally* Exs. 19A, 19D, Ex. 34E. Further, Rose Ann Amato could not confirm during her testimony that any of the checks made out to "cash" from Anna Perrone's bank account, with or without a "for" designation, were in fact paid to home health aides. Tr. 329-330. For example, Attorney Goidell, in showing Exhibit 19A to Rose Ann Amato, elicited the following testimony with respect to records of checks paid from Anna Perrone's account:

> Q.    Check number 1776 is made out to cash in the SUM $500 and endorsed by you, correct?
>
> A.    Yes.
>
> Q.    As you sit here now, do you have any idea whether this was payment to you or payment for the benefit—for the compensation of aides?
>
> A.    I have no idea.
>
> Q.    From time to time is it correct that aides were paid by cashing checks and then using the proceeds to pay them?
>
> A.    Yes.
>
> Q.    Check number 1175, which is the following check also in the sum of $500 payable to cash, looks like a week before, in December 2006, also endorsed by you, correct?
>
> A.    Yes.
>
> Q.    Do you have any idea whether or not that was cash that was paid to you or whether it was eventually paid over to aides?
>
> A.    I have no idea.

> Q. And four pages later, check number 1793, from September 2007, made payable to cash in the sum of $500, it was endorsed by you, correct?
>
> A. Yes.
>
> Q. Do you know whether or not that was payable to the aides or was [it] to you?
>
> A. I don't know.

Tr. 329-330; Ex. 19A. Defendants introduced no documentary evidence or testimony (other than their own general representations) that checks made out to "cash" were actually used to pay aides, and that these payments exceeded Anna Perrone's monthly income, requiring Defendants to expend their own resources for Anna Perrone's care.

Rose Ann never prepared or supplied her brother with an accounting of any kind setting forth the expenditures she was making on her mother's behalf. She proffered that the reason she has little evidence is because the Plaintiff always assured her that she would be reimbursed. Tr. 335-336. If it were true that Anna Perrone's expenses for Aging at Home aides exceeded $13,000 per month, it is unclear to the Court why Rose Ann would request only $4,500 per month when the reverse mortgage line of credit was opened. When first questioned about the reverse mortgage line of credit, Rose Ann testified that Joseph Perrone "took care of it. I don't understand about it." Tr. 240. Moments later, however, Rose Ann testified that she understood that the reverse mortgage would provide funding on a monthly basis and that money would be available to be used for Anna Perrone's care. Tr. 241. Rose Ann also acknowledged that she could have requested any amount of money per month from the reverse mortgage. Tr. 242-243. According to her own testimony, Rose Ann had been managing her mother's finances for several months by the time the reverse mortgage line of credit was taken out on the Premises. Tr. 243. Yet, when she was subsequently asked whether she knew approximately what Anna Perrone's

bills were at the time the reverse mortgage was taken out, she stated that she did not, because she "had no experience." Tr. 243. Immediately thereafter, Rose Ann confirmed that she was paying the bills every month on behalf of Anna Perrone, and that she was very familiar with what it was costing to take care of her mother on a monthly basis. Tr. 243-244. During his questioning, Attorney Sansone pressed Rose Ann about these inconsistencies:

> Q. So can you explain to me when you went to the closing you took a $4,500 draw, clearly at that point the $6,800 a month, the $4,500 and the [$2,300] she was getting, was going to be enough to pay her bills? You knew that?
>
> A. No, I didn't.
>
> Q. So you'd paid her bills for six months. You knew what the stream of payments were—
>
> A. Right.
>
> Q. — because you were dealing with Aging at Home.
>
> A. Right.
>
> Q. But when you went to the reverse mortgage, you didn't say, no, [$]4,500 a month isn't going to do it. I really need more?
>
> A. Right.

Tr. 244. In sum, the fact that Rose Ann did not request more funds from the reverse mortgage line of credit when she was fully aware of Anna Perrone's monthly expenditures, and when it was within her power to do so, leads the Court to conclude that the $4,500 combined with Anna Perrone's monthly income of approximately $2,265 per month, was, in fact, sufficient to cover Anna Perrone's monthly expenses at the time. These facts undermine Rose Ann's testimony about the payments to aides exceeding $13,000 a month during this period.

In addition, Defendants have not provided support for their contention that Anna Perrone's expenses exceeded her income after she moved to Florida in May 2007. Anna Perrone moved from the Premises in New York to the Nature's Edge assisted living facility in May 2007. SF 35. It appears undisputed that the fee for Nature's Edge was $2,300 per month. Tr. 233. Three months later, in August 2007, Anna Perrone was moved to a different assisted living facility in Florida, namely, "The Palms," where she resided until her death in October 2008. Tr. 232-233. It is also undisputed that the charge for The Palms was $3,300 per month. Tr. 233. Anna Perrone's income at the time of approximately $6,765 per month, even without the increases to the reverse mortgage line of credit, likely covered these assisted living facility expenses, with additional funds left over for other purposes.

However, Defendants maintain that along with the monthly fees paid to these assisted living facilities, they also made additional payments to aides and "outside help" during the period Anna Perrone resided at these facilities. Tr. 232-236. Rose Ann testified that aides were hired for approximately eight hours per day while Anna Perrone resided at Nature's Edge and The Palms, and that these aides were paid anywhere from $15-$18 per hour. Tr. 341-343. Again, other than Defendants' own testimony, and some bank records including several checks paid to "cash" endorsed by Rose Ann Amato (and purportedly paid to aides during this period), Defendants have not introduced any evidence that outside aides were in fact paid during the time Anna Perrone resided at these facilities. As noted previously, Rose Ann made it clear that she had no records to confirm that she made payments to aides out of her checking account either in New York or in Florida because she paid them in cash. Tr. 225. Rose Ann further testified that she had no receipts for the numerous payments to "cash" that she signed and endorsed herself.

Tr. 351-352.  Although Rose Ann acknowledged that assisted living facilities in Florida were live-in facilities that advertised 24-hour care to patients, she maintained that she paid additional health aides while Anna Perrone resided at these 24-hour care facilities.  Tr. 232-235.  Based on the evidence (and lack of the same), the Court finds Rose Ann's testimony regarding payment to outside aides while Anna Perrone resided at the assisted living facilities not credible.

Finally, Defendants claim that above and beyond the fees paid to home health aides, they also paid for: food for Anna Perrone and the health aides; supplies such as cleaning products, diapers, bed pads and gloves; life insurance; medication; property taxes; landscaping for the Premises, utilities for the Premises; and a renovation of the bathroom, among other things, as well as Anna Perrone's funeral expenses.  *See* Tr. 332-335.  Defendants claim that payments of these expenses, together with the payments to the health aids and assisted living facilities, exceeded Anna Perrone's income resulting in their having to expend their own resources, for which they claim they are entitled to reimbursement.  Tr. 231, 316-317, 319, 336   .

It makes sense to the Court that a variety of additional expenses would have been required to support Anna Perrone during her illness, other than those payments made to health aides and assisted living facilities, particularly while Anna Perrone still resided in New York and benefited from in-home care as opposed to a 24-hour assisted living facility.  However, Defendants submitted little evidence to support their claims that these types of expenses exceeded Anna Perrone's income and assets.  For example, Rose Ann testified that Defendants paid $10,000 in taxes on the Premises from 2004-2008.  Tr. 335.  The only documentary evidence Defendants provided to support this assertion is a record of a reimbursement credit for

tax overpayments on the premises, evidencing that taxes were in fact paid.[12]  Tr. 335; Ex. 7

(Closing Statement for Premises).  Rose Ann also testified that she "may have" paid her mother's

car insurance in the amount of $1,562.90, but that she was "not sure."  Tr. 213-214; Ex. 19A

(check #1952).  Rose Ann also identified two check made out to Lord & Taylor for clothes for

her mother in the amounts of $98 and $58.  Tr. 220; Ex. 19A (check #1746, #1585).  Finally,

Rose Ann identified a check made out to Tower Insurance Company for $690 from February 25,

2005, but she was unable to identify what this payment was for.  Tr. 237; Ex. 19A; (check

#1611).[13]  The Court therefore questions Defendants' assertions that these expenses exceeded

Anna Perrone's monthly income and assets in light of this limited testimony.

Further, although the parties stipulated at trial that Anna Perrone's funeral expenses

amounted to $15,391, Tr. 346-347, it is not apparent that Defendants would have needed to

expend any of their own resources to pay these costs, even without the increases to the reverse

mortgage line of credit.[14]

---

[12]   The closing statement for the Premises indicates that Defendants were given a $68.00 "Town Tax" credit and a $102.00 "School Tax" credit.  *See* Ex. 7 (Premises Closing Statemen)t.

[13]   Defendants repeatedly reference "Exhibit 52" in their Pre- and Post-Trial briefs, in support of their contention that Defendants' expenditures exceeded Anna Perrone's income. This "exhibit" appears to be a list of "estimated expenses" from the time of Anna Perrone's stroke until her death on October 24, 2008, apparently prepared by Defendants although the creator is not identified.  For example, Defendants list approximately $71,545.00 spent on food for Anna Perrone and the health aides, along with cleaning supplies, diapers, bed pads and gloves; $35,457.00 for taxes, insurance, landscaping, utilities and repairs for the Premises; $20,000 for AARP funds, life insurance, and prescriptions; $10,145.00 for traveling expenses for aides to the hospital and doctors' offices, among a number of other "estimated" expenses.  This exhibit was submitted to the Court with the benchbook of exhibits prior to the trial, but was never referenced at trial.  Moreover, no underlying documentation supporting or verifying any of these entries was provided.  Therefore, the Court affords little if any weight to this exhibit.

[14]   The Court points out that Anna Perrone had a life insurance policy which may well have covered her funeral expenses.  Rose Ann Amato and Joseph Perrone were the beneficiaries on that policy.  Tr. 80.

The Court finds that Anna Perrone's expenses may have exceeded her income and assets during the six-month period from October 2005, when Aging at Home was hired, until the opening of the reverse mortgage in April 2006, requiring some contribution from Defendants' own funds. However, Defendants' claims that they are entitled to reimbursement of the entire amount of funds from the sale of the Premises and that expenses for Anna Perrone necessitated such substantial increases in the reverse mortgage line of credit, are not credible based on the record before the Court.[15] The Court makes this finding based on Defendants' inconsistent testimony with respect to these expenses and Defendants' lack of documentary support. While the Court understands that some of the daily expenses for Anna Perrone may not have been documented, particularly in light of Defendants' claim that Plaintiff assured Rose Ann that she would be reimbursed for Anna Perrone's care, Defendants' wholesale lack of support for their assertions is troubling. The Court highlights one additional example here, from Attorney Sansone's direct examination of Rose Ann Amato:

> Q. And then although you had $270,000 at the time of the closing, when he called you in November you told him there was only $80,000 left?
>
> A. Right.
>
> Q. So it is your contention that at the time of the sale you were owed $200,000?
>
> A. Yes, it could be less.
>
> Q. Do you have any documentation or receipts—
>
> A. No.
>
> Q. —to substantiate that claim?

---

[15] For example, Anna Perrone's income from about October 2007, when the reverse mortgage line of credit funds were increased to $9,000, until May 2007, one month before the sale of the Premises was approximately $11,265.

A.   No.

Q.   And that would include not one record from the business?

A.   I don't know.

Q.   One record from anyplace?

A.   I—

            …

Q.   You have no records?

A.   No.

Q.   We just went over a bunch of payments that were made out of that joint account.

A.   Right.

Q.   Either on behalf of the restaurant, for the construction, for the rent of the restaurant space or for your own mortgage, a total of 20,000 plus?

A.   Yes.

Q.   Did you ever reimburse that account for that $21,000?

A.   No.

Q.   We went over a list of payments that amount to $25,000 that you agreed covered various things that were for your own personal use; rents for the restaurant space or your own personal mortgage.  Did you ever reimburse the account for that 25,000?

A.   No.

Q.   I just showed you the $6,000 in cash, the check that you cashed, did you ever reimburse for that $6,000?

A.   No.

Tr. 285-287.  This lack of documentation contrasts markedly with Plaintiff's evidence, in the

form of documents and testimony, that at least $47,401.44 in funds from the accounts where the

reverse mortgage line of credit funds were deposited were used for the benefit of Defendants, to make mortgage payments on Defendants' home in Florida; to pay homeowners dues; to pay personal credit card obligations and other personal expenses; and to pay rent and other business costs and obligations of Jack's Pizzeria. SF 63-69. Also of concern is the number of checks made out to "cash" and endorsed by Rose Ann Amato, from both the accounts of Anna Perrone and the accounts where the reverse mortgage line of credit funds were deposited, with little supporting evidence that these payments were used to reimburse aides, other than Rose Ann's own testimony.

It makes little sense to the Court that if Anna Perrone's expenses were as high as Defendants claim, why Rose Ann did not initially request a larger monthly drawdown from the reverse mortgage line of credit when she had the opportunity, particularly when Rose Ann had been handling her mother's expenses for some time. Also, if Defendants truly were owed these monies, it begs the question why, when Plaintiff enquired about his share of the proceeds from the sale of the Premises, Rose Ann did not explain that these funds had been used for the care of Anna, but instead told him that she had to speak to her accountant regarding certain tax issues. SF 53. These factual circumstances, as well as those discussed below, compel the conclusion that Defendants' testimony to the effect that they expended their own funds for Anna Perrone's care -- necessitating such substantial increases in the reverse mortgage line of credit and the use of the funds from the sale of the Premises for "reimbursements" -- generally lacks credibility.

## 2. *Disputes Regarding Funds From the Reverse Mortgage Line of Credit*

Plaintiff claims that Defendants increased the drawdowns on the reverse mortgage line of credit without his knowledge -- first, from $4,500 to $6,000 per month, and then from $6,000 to $9,000 per month. Tr. 52-53, 59. According to Plaintiff, Rose Ann altered the durable power of attorney to enable her to request these increases without Plaintiff's consent and signature. Pl.'s Post-Trial Mem. at 6. Plaintiff maintains that Rose Ann also wrote herself a $6,000 check from the account where the funds from the reverse mortgage line of credit were deposited. *Id.* at 10. Defendants used this $6,000, Plaintiff asserts, and additional money from the increases on the reverse mortgage line of credit for the benefit of Defendants and Jack's Pizzeria. *Id.* at 10-13. Further, Plaintiff claims that the Defendants lied at the closing of the reverse mortgage line of credit when they stated Rose Ann was owed a $20,000 reimbursement for funds expended on the care of Anna Perrone. *Id.* at 9-10. Plaintiff argues that Defendants' actions divested the Premises of equity that would rightfully have been paid to Plaintiff upon the sale of the Premises. *Id.* at 10. [16]

Defendants maintain that Rose Ann Amato informed Plaintiff about the increase to the reverse mortgage line of credit, that Plaintiff consented to those increases, and that the additional funds were necessary for the care of Anna Perrone. Defs.' Pre-Trial Mem. at 5-7. Defendants

---

[16] The Court also notes Plaintiff has contended that, apart from the funds misappropriated from the reverse mortgage line of credit, Defendants used funds from Anna Perrone's personal checking account for their own personal purposes. Pl.'s Post-Trial Mem. at 13. For example, Rose Ann testified that she paid personal obligations, including credit card debt, mortgage payments, homeowners' dues, and business obligations of Amici's, including the business' tax obligations and Amici's mortgage payments, from her mother's personal checking account. Tr. 211-221. Plaintiff does not claim that these funds are part of his damages, but contends that that these "misappropriations" completely undermine Defendants' arguments that they were using their own money to care for Anna Perrone, and that they show a pattern of outright theft which started soon after Anna Perrone's stroke. Pl.'s Post-Trial Mem. at 13.

further claim that the $20,000 reimbursement and other funds from the reverse mortgage line of credit were used for the care of Anna Perrone. *Id.*; Tr. 48-50. Although Defendants stipulated that $47,401.44 was taken from the accounts where the reverse mortgage line of credit funds were deposited and used those monies for Defendants' personal purposes, Defendants argue that they made deposits of their own personal funds into those accounts which exceeded any withdrawals. *See* Tr. 308-309.

### a. $20,000 "Reimbursement" from the Reverse Mortgage Line of Credit Funds

It is undisputed that initial funds from the reverse mortgage line of credit in the amount of $24,485.00 were deposited to the account of Anna Perrone (HSBC Acct. 4874). SF 28. Plaintiff claims that Rose Ann represented at the closing that she was owed a $20,000 reimbursement for her own expenditures related to Anna Perrone's care. Tr. 48-50. Plaintiff maintains that he consented to this reimbursement based on Rose Ann's representation. Tr. 48-49. This was the only time prior to Anna Perrone's death, according to the Plaintiff, that Rose Ann told him she was owed money for the care of Anna Perrone. Tr. 48-50, 124-125; 173, 185. Plaintiff seeks to recover half of that $20,000 "reimbursement" as part of his damages. Pl.'s Post-Trial Mem. at 9-10. Plaintiff testified consistently on these points throughout the trial. *See* Tr. 48-50, 124-125, 173, 185.

In contrast, Rose Ann's Amato's testimony regarding these reimbursement monies was vague and unclear. Rose Ann first contended that she did not recall stating to her brother that she was owed the $20,000 reimbursement. Tr. 241. Then she testified that she was "paid back, yeah, something, I don't know, I don't recall. I really don't." *Id.* Thereafter, she maintained that she received the money and that she used the money to "pay bills." Tr. 242. Later, she

claimed that she never told her brother that she was owed $20,000. Tr. 327. Instead, she testified that around the time of the closing, she told her brother that she was owed "a lot of money." *Id.*

It appears undisputed that Rose Ann told Plaintiff around the time the reverse mortgage line of credit was obtained that she was owed money for her own expenditures for the care of Anna Perrone and that Plaintiff consented to a reimbursement based on that representation. Further, as the Court has noted, during the six-month period from October 2005 to April 2006 when the reverse mortgage line of credit was opened, Anna Perrone's income did not cover the expenses required for her Aging at Home in-home care, nor for other necessary items such as food, diapers, funds to maintain the Premises, etc., and it is unclear whether Anna Perrone's assets would have covered these expenses. Therefore, it appears that Defendants were, in fact, owed some money for the care of Anna Perrone during this time period.

### b. Plaintiff's Knowledge of the Reverse Mortgage Line of Credit Drawdowns

As outlined in Section II(A), *supra*, Rose Ann requested two increases in the reverse mortgage line of credit. On September 18, 2006, Rose Ann Amato signed Anna Perrone's name to a letter to Seattle Mortgage, requesting an increase from $4,500 to $6,000. *See* SF 33. Specifically, the letter stated:

> My name is Anna Perrone 632 Jefferson Street West Hempstead, New York 11552. I would like to change my monthly payments of $4,500.00 a month to $6,000.00 a month. I understand this would reduce the number of monthly payments I have.

SF 34. This increase was approved. Then, in March of 2008, Rose Ann Amato opened a new Bank of America account in her name and the name of Anna Perrone (BOA Acct. 6618). SF 38.

By letter dated March 24, 2008, Rose Ann Amato directed Bank of America to wire the $9,000

monthly funds from the reverse mortgage line of credit directly into Bank of America Joint Acct.

6618.  Based on the affidavit sworn to by Rose Ann Amato on March 26, 2008, it is undisputed

that Rose Ann Amato provided the Bank of America with a copy of the Power of Attorney for

Anna Perrone previously executed on May 20, 2003.  SF 39.  Further, Rose Ann altered that

Power of Attorney.

> The Power of Attorney includes the following language:
>
> (*If more than one agent is designated, CHOOSE ONE of the following two choices by putting your initials in ONE of the blank spaces to the left of your choice:*)
>
> > [  ]  Each agent may SEPARATELY act.
> > [  ]  All agents must act TOGETHER.
>
> (*If neither blank space is initialed, the agents will be required to act TOGETHER).*

Tr. 265; Ex. 6 (emphasis in original).  In the copy of the Power of Attorney presented at trial

[Ex. 6], the initials "AP" and a check mark appear next to the phrase "[e]ach agent may

SEPARATELY act."  *See id.*

Plaintiff claims that he did not know about the increases from the reverse mortgage line

of credit and that Rose Ann altered the Power of Attorney by initialing "AP" in the space noted

in order to unilaterally obtain the monthly increases.  Pl.'s Post-Trial Mem. at 6.  Rose Ann

admits that she altered the Power of Attorney, but that Plaintiff knew about the requested

increases in any event.  Tr. 265.  Rose Ann's testimony with respect to this issue is contradictory.

First she testified that she was unaware that the Power of Attorney initially required both her

signature and her brother's signature for actions taken on behalf of Anna Perrone.  Tr. 265.  She

then confirmed that she altered the power of attorney by making the "AP" notation, but that that Bank "told [her] to do that" when she opened the Florida Bank of America account where the $9,000 monthly reverse mortgage line of credit payments were subsequently wired. *See* Tr. 265-266. Then she also conceded that she would probably have been required to submit the Power of Attorney to obtain the earlier increase from $4,500 to $6,000. Tr. 266-268 ("I don't know. Did they? I'm sure they did. I don't know").

Attorney Ryan also testified regarding the Power of Attorney. *See* Tr. 397-401. He confirmed that the copy of the Power of Attorney from his file did not include the "AP" initials or check mark, and that the document he had prepared had been changed. Tr. 398-401. Attorney Ryan also testified that Anna Perrone never requested such a change. *Id.*

Based on the testimony of Attorney Ryan and Rose Ann Amato, the Court concludes that Rose Ann altered the Power of Attorney so that she could unilaterally request the increase in the monthly payments from the reverse mortgage line of credit. Notwithstanding this finding, however, the Court must still resolve whether Plaintiff was aware of and consented to the increases. Rose Ann testified she told her brother that she was requesting these increases. Tr. 267-268. Plaintiff claims that his sister never informed him about the increases, and that he did not learn about them until after the commencement of this litigation. Tr. 52-53, 58-59. The fact that Rose Ann unilaterally altered the Power of Attorney supports Plaintiff's contention that his sister did not inform him about these increases. These circumstances beg the question, if Plaintiff was aware of and consented to these increases, why did Rose Ann not simply obtain Plaintiff's signature on the necessary documentation requesting the increases, instead of altering the Power of Attorney to unilaterally obtain them herself?

In any case, Defendants pointed to documents obtained from Bank of America (the reverse mortgage line of credit lender) to support their contention that Plaintiff knew about these increases. *See* Tr. 148-157. Joseph Perrone testified several times that he did "not recall" having any discussions with the lender regarding the increases from the reverse mortgage line of credit. Tr. 150-157. However, an entry in Bank of America's call log from September 18, 2006, around the time of the first increase from $4,500 to $6,000, states "borr and brother Joe called about this COP." *See* Ex. 6 (BOA Call Log). It is not completely clear from the document whether the entry refers to a call made to Joseph Perrone or a call received from him. An entry from later that same day reads, "Spoke with Joseph Perrone. Borrower wants ELOC instead of doing a COP for October. Will be sending in a COP to increase monthly payments to $6,000 monthly." *Id.* Further, an entry from October 22, 2007, around the time of the increase from $6,000 to $9,000, reads, "borr gave auth to Joseph to go over the account. [I] explained what the COP purpose was for. [I] told them that the agreement would need to be signed before the due date. Joseph want to ask hung about the details in the modification." *Id.* Based on this information, the Court finds that Plaintiff was likely aware of the increases to the reverse mortgage line of credit, even assuming Rose Ann unilaterally altered the Power of Attorney to obtain them. However, the issue still remains as to whether these increases were necessary for the care of Anna Perrone. As noted, the Court has already found that the increases to the reverse mortgage line of credit and monies from the sale of the Premises did not appear to be necessary for the care of Anna Perrone.

### c. Defendants' Use of the Reverse Mortgage Line of Credit Funds for Their Own Benefit

Even assuming that Plaintiff was aware of the reverse mortgage line of credit increases, Plaintiff denies that he consented to or had knowledge that these funds were being used to pay for Defendants' own personal expenses and the expenses of Jack's Pizzeria. Tr. 60. Defendants acknowledge that they took certain funds from HSBC Account 8600 and Bank of America Account 6618) -- accounts that contained the funds from the reverse mortgage line of credit -- for personal use, namely, to make mortgage payments on Defendants' home in Florida; to pay homeowners dues; to pay personal credit card obligations and other personal expenses; and to pay rent and other business costs and obligations of Jack's Pizzeria. SF 59-69. Rose Ann Amato testified extensively regarding her payment of personal credit cards and other personal bills, along with bills for Jack's Pizzeria, from the accounts containing the funds from the reverse mortgage line of credit. 211-221. For example, Rose Ann testified (and the parties have stipulated) that mortgage payments for Defendants' residence in Florida and homeowners' dues were paid from these accounts. Tr. 272-275. Likewise, Rose Ann stated (and the parties have stipulated) to numerous payments being made for the benefit of Jack's Pizzeria. *Id.* Plaintiff also highlighted the fact that that the reverse line of credit increases were made around the time that Defendants were conducting a build-out of Jack's Pizzeria in Florida:

> Q. Now, isn't it true that the increase in the draw was done because you needed to complete the buildout of Jack's restaurant?
>
> A. We also had a house in New York to maintain.
>
> Q. All of these payments were all made for the payment of Jack's restaurant, correct?
>
> A. Yes.

Q.     You had your own assets, did you?  You had money?

A.     Yes, I had money.  I used everything.

Q.     I'm saying back when you made these payments?

A.     Yeah, I had money.

Q.     When Jack's was being buil[t] out you had your own money, right?

A.     I guess so, yes.

Q.     It's not a guess so.  Did you have money or didn't you?

A.     We had money.

Q.     You had—you paid the contractors out of the joint account using your mother's money not of our own personal account even though it was your business.

A.     Right.

Tr. 274-275.  The Court finds it significant that when Rose Ann was questioned about whether the increases in the reverse mortgage line of credit were taken out to help with the build-out of Jack's Pizzeria, Rose Ann did not deny this assertion, but simply stated that Defendants "also" had a house in New York to maintain.  Tr. 274.  Also, when asked about the first increase on the reverse mortgage line of credit from $4,500 to $6,000, Rose Ann testified that Defendants "had two places to take care of."  Tr. 268.  The first increase, made in September of 2006, occurred when Anna Perrone was still residing in New York.  Therefore, the only "place" other than the Premises Rose Ann could have been referring to was Defendants' own residence in Florida.  The reverse mortgage monies were not intended to be used for Defendants' mortgage expenses, homeowners' dues, or other personal expenditures.

The parties have stipulated that funds used for Defendants' personal purposes or for the benefit of Jack's Pizzeria from the accounts where the reverse mortgage monies were deposited

totaled $47,401.44. *See* SF 63, 69.[17] Further, the parties stipulated that these payments were made without the knowledge or consent of Joseph Perrone. SF 72.

Moreover, Plaintiff alleges that in addition to the $47,401.44 that the parties have stipulated, Rose Ann misappropriated at least an additional $6,000 from the joint HSBC account where the line of credit funds were deposited. Tr. 280, 287, Ex. 34-E (Check #317). This check, dated December 5, 2007, was endorsed by Rose Ann Amato and made payable to "cash." Plaintiff claims that no credible explanation has been given for this withdrawal. In sum, Plaintiff claims that he is owed one half of the $47,401.44 that the parties have stipulated Defendants' used for their own personal purposes; and (ii) one half of the $6,000, representing the check made out to "cash" and endorsed by Rose Ann.[18] *See* Pl.'s Post-Trial Mem. at 10.

Rose Ann argues that she did not distinguish in any way between her own bank account and the accounts where the reverse mortgage line of credit funds were deposited. Tr. 308-309, 339. At trial, Rose Ann generally claimed that she used the accounts interchangeably and made numerous deposits of her own funds into these accounts. *Id.* In her post-trial brief, Rose Ann claims for the first time that deposits of her own personal funds into these bank accounts totaled $81,579.00. Rose Ann Amato Post-Trial Mem. 8-9. She did not testify regarding these specific deposits at trial to affirm that they came from hers and Jack's own personal resources, or to discuss them in any context whatsoever. However, it seems likely that, since Rose Ann managed the accounts at issue, any funds deposited in them apart from the reverse mortgage line of credit

---

[17] This sum is calculated from the two separate accounts where the reverse mortgage line of credit funds were deposited: (i) from Rose Ann's HSBC Account 8600 with Plaintiff, where the funds were initially deposited beginning April 2006; and (ii) from the Florida Bank of America Account 6618, in the name of Rose Ann Amato and Anna Perrone, where funds were deposited beginning April 1, 2008.

[18] These funds are in addition to half of the $20,000 reimbursement Rose Ann allegedly claimed when the reverse mortgage line of credit was opened.

funds would come from Anna Perrone's income or Defendants' own personal resources. Even so, in light of the numerous payments made out to "cash" and endorsed by Rose Ann from the accounts where the reverse mortgage line of credit funds were deposited, it is not clear that Defendants' deposits truly exceeded their withdrawals from these accounts, particularly in light of the Court's finding that increased funds from the reverse mortgage line of credit were not necessary for the care of Anna Perrone.

In any case, the core issue here is not whether Defendants' personal deposits into these accounts exceeded their withdrawals, but whether the increases in funds from the reverse mortgage were used for the care and benefit of Anna Perrone, or rather, whether the additional monies from these increases were used by Defendants for their own personal purposes. Regardless of whether Defendants deposited their own monies into the same accounts where funds from the reverse mortgage line of credit were deposited, the Court has found that Defendants' claims that additional funds from the reverse mortgage line of credit were necessary for the care of Anna Perrone are not credible. Even if Plaintiff was aware of these increases, the Court finds that Plaintiff certainly did not consent to any money from the reverse mortgage line of credit being used for Defendants' personal expenses.

### 3. *Jack Amato's Knowledge of the Agreement and the Reverse Mortgage*

In his Post-Trial brief,[19] Jack Amato claims he had no knowledge of the Agreement until 2009, and that Attorney Ryan falsely testified that Jack knew about the Agreement and was involved in discussions at the meeting about the Agreement. Jack Amato Post-Trial Mem. at

---

[19]    As noted previously, the Court received a letter from Defendant Jack Amato entitled "Explanation with facts." DE 126. Jack Amato asked the Court to dismiss the claims against him, and included a page entitled "Revised version of income & expenses for Anna Perrone." *Id.* The Court points out that during a telephone conference with the parties on July 16, 2012, the

3, 5.  The Court finds that these assertions are not accurate and contradict the evidence presented at trial.

Plaintiff testified that Jack Amato was involved in the decisions regarding Anna Perrone and that it was always Jack, Rose Ann, and Plaintiff involved in these decisions.  Tr. 44.  Further, Plaintiff testified that Jack was present at the meeting with Attorney Ryan where the Agreement was discussed, and that Jack participated in the meeting and asked questions.  Tr. 32, 73.   Jack was also aware of the reverse mortgage line of credit, according to the Plaintiff, and that Plaintiff, Jack, and Rose Ann discussed opening this line of credit.  Tr. 46-47.  Plaintiff testified that he, Jack and Rose Ann discussed by phone selling the Premises.  Tr. 61-62.  According to Plaintiff, after the sale of the Premises, Rose Ann directed Plaintiff to speak with Jack about the proceeds from the sale.  Jack told him on a telephone call that nothing was left of the proceeds.  Tr. 68-69.

Attorney Ryan confirmed that Jack Amato was present at the November 27, 2004 meeting where a transfer of the Premises into Rose Ann's name was discussed, although Jack accuses Attorney Ryan as having falsely testified.  Tr. 401.  Attorney Ryan testified that Jack Amato participated in the discussions at the meeting and that "his main focus was on the nature

---

Court agreed to accept this submission as Defendant Jack Amato's post-trial brief.  *See* DE 127 (Civil Conference Minute Order).  The Court, however, cautioned all of the parties as follows:

> Before turning to the motion to withdraw . . . I addressed one issue concerning post-trial briefing with the parties.  I made it clear to the attorneys as well as to the two individual defendants who were on the call that the Court, as well as the parties, are bound by the record of the trial, which includes the testimony rendered and the exhibits entered into the record. ***The Court cannot consider any materials or information outside that record in rendering its decision.***

DE 127 (emphasis supplied).  Therefore, the Court cannot consider the single page "Revised version of income & expenses" because there is no indication who composed this document and when it was composed and the document was not introduced at trial.

of the documents that his wife was signing and what impact that was going to have on their continuing occupancy of the home." Tr. 403-404. At that meeting, according to Ryan, it was discussed and agreed that Joseph Perrone would have a one-half interest in the sale of the Premises, notwithstanding the transfer of the Premises to Rose Ann. Tr. 405. On cross-examination, Attorney Ryan again confirmed that Jack Amato attended the November 27, 2004 meeting. Tr. 410.

Jack Amato's own testimony regarding his lack of knowledge with respect to the Agreement and the reverse mortgage line of credit is inconsistent and contradictory. Jack first testified that in October 2004, after Anna Perrone had her stroke, he asked Plaintiff "what we were going to do," and that Plaintiff told him to "mind [his] own business." Tr. 367. After this conversation, Jack claims he was not "involved anymore." 367:19-24. Jack Amato claimed several times on the record that he never spoke to Joseph Perrone again, except for "hello and good-bye" when Plaintiff visited Defendants' home in Florida. Tr. 375. However, when confronted with Plaintiff's claim that he had a telephone conversation with Jack concerning the proceeds from the sale of the Premises, Jack testified that a conversation took place during which Plaintiff threatened to sue Defendants. Tr. 376.

Jack further testified that he went to a meeting with Rose Ann, Joseph Perrone and Attorney Ryan, contradicting his representation that he was "not involved." Tr. 368. However, Jack testified that he did not remember any discussion about preserving or protecting the Premises and that he never discussed what was going to happen to the Premises with Rose Ann. Tr. 368. Then, when informed of previous testimony that Jack was at the meeting and that he asked questions about preserving the house, Jack replied that he "wouldn't deny" that that

happened. Tr. 369. Then, once again contradicting this testimony, Jack stated that there was no discussion about preserving the house or signing it over to Rose Ann, and that he never learned the house was signed over to her. Tr. 370. However, in his post-trial brief, Jack argues that Rose Ann deposited the checks from the sale of the Premises in the couple's joint Bank of America account to reimburse Rose Ann for out-of-pocket expenses for Anna Perrone. Jack Amato Post-Trial Mem. at 3. Jack also confirmed while testifying that the proceeds from the sale of the Premises were deposited into the joint bank account with his wife. Tr. 373. Jack denied any knowledge that contractors for Jack's Pizzeria were paid from the account containing the funds from the reverse mortgage line of credit, although he apparently was the one paying the bills. Tr. 372.

With respect to Jack's knowledge of Plaintiff's share in half the proceeds of the Premises, at one point during his testimony, counsel confronted Jack Amato with a prior Answer filed in this action, where Jack confirmed in a signed statement that "John E. Ryan Esq. told Joseph Perrone what he has to do for the protection of the premises from claims [and] leins and to make Rose Ann Amato sign an agreement, which protects Joseph Perrone, for half his share of the house." *See* Tr. 379; Ex. 18. Jack claimed that he did not remember writing this, and that he was appearing *pro se* at that time. Tr. 379. However, later in his testimony, Jack confirmed that he understood Plaintiff was to receive half the proceeds of the sale of the Premises. Tr. 386.

Jack testified that he never asked Rose Ann if she paid Plaintiff his half of the proceeds from the sale of the Premises, because "the conversation never came up." Tr. 387. Jack confirmed that "the conversation never came up" even after Rose Ann deposited the $269,000 in Defendants' joint account. Tr. 387. This assertion surprises the Court, particularly given the

amount of money at issue, and the fact that Jack Amato admitted to a telephone conversation in which Plaintiff purportedly threatened a lawsuit over those very funds.

Based on the evidence and testimony offered at trial, particularly Jack Amato's inconsistent and contradictory testimony which this Court determines is lacking in credibility, the Court finds Jack Amato was fully aware of the substance of the Agreement and the existence of the reverse mortgage line of credit.

### III.    CONCLUSIONS OF LAW

#### A.    Standard of Review

Federal Rule of Civil Procedure 52(a) provides that with respect to bench trials, the court "shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58."  FED. R. CIV. P. 52(a); *RLI Ins. Co. v. JDJ Marine, Inc.*, No. 07 Civ. 5946, 2012 WL 3765026, at *1 (S.D.N.Y. Aug. 29, 2012).  Rule 52(a) further provides that such findings of fact, "whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."  FED. R. CIV. P. 52(a); *RLI Ins. Co.*, 2012 WL 3765026, at *1.

#### B.    Breach of Contract

As an initial matter, the Court finds that Judge Platt's ruling on Plaintiff's motion for summary judgment on the breach of contract claim fully disposes of that claim.  *See Reiseck v. Universal Communications of Miami*, No. 06 Civ. 0777, 2012 WL 3642375, at *2 (S.D.N.Y. Aug. 23, 2012) (denying motion for summary judgment where it constituted attempt to relitigate the court's prior decision to deny summary judgment); *Sankar v. City of New York*, No. 07 CV

4672, 2012 WL 2923236, at *1 (E.D.N.Y. July 18, 2012) (denying motion for reconsideration as "impermissibl[e] attempt to relitigate issues already fully considered and decided"); *Faiveley Transport USA, Inc. v. Wabtec Corp.*, No. 10 Civ. 4062, 2011 WL 1899730, at *4 (S.D.N.Y. May 13, 2011) (rejecting summary judgment motion as "thinly disguised attempt to relitigate issues" already lost on motion to dismiss); *NIC Holding Corp. v. Lukoil Pan Americas*, No. 05-CV-09372, 2009 WL 996408, at *2 (S.D.N.Y. Apr. 14, 2009) (refusing to indulge defendant's efforts to revive its unsuccessful summary judgment arguments in motion *in limine*); *United States Underwriters Ins. Co. v. Falcon Constr. Corp.*, No. 02 Civ. 4182, 2006 WL 3146422, at *2-3 (S.D.N.Y. Oct. 30, 2006) (finding *in limine* motion attempt to relitigate issue already decided; proper vehicle to contest summary judgment decision was timely motion for reconsideration).

Plaintiff's counsel argued at trial that the breach of contract claim had been fully resolved. Specifically, Plaintiff's counsel stated that "[it's] already been decided that the agreement was clear, it couldn't be changed orally, and that my client was entitled to have half of the net proceeds [from the sale of the Premises]." Tr. 437.

Defendants, on the other hand, argued both during the trial and in their pre- and post-trial briefs that the Plaintiff consented to an oral modification of the Agreement, allowing Rose Ann Amato to reimburse herself the costs she expended for Anna Perrone's care from the proceeds of the sale of the Premises. Defs.' Pre-Trial Mem. at 6-7; Post-Trial Memorandum of Defendant Rose Ann Amato ("Rose Ann Amato Post-Trial Mem.") [DE 20] at 16-19; Tr. 21. Specifically, in their pre- and post-trial briefs, Defendants argue: (i) that a verbal agreement is enforceable even when there is a written agreement between the parties containing a merger clause, when the

subject matter of the verbal agreement does not contradict or modify the terms of the written agreement; (ii) the alleged verbal agreement between Rose Ann and Plaintiff authorizing Rose Ann to deduct any amount she expended for the care of Anna Perrone does not contradict or modify the terms of the written Agreement; (iii) Plaintiff conceded that the Agreement was modified by the parties' agreement to reimburse Rose Ann; and (iv) the terms of the Agreement do not prohibit oral modification, and the oral modification must be enforced. Defs.' Pre-Trial Mem. at 6-7; Rose Ann Amato Post-Trial Mem. at 16-17.

Defendants further argue that Judge Platt's Order granting summary judgment to Plaintiff on the breach of contract claim "did not consider or address whether any damages arising from that breach should be offset by the amounts expended by Defendants for the care and assistance of Anna Perrone." Defs.' Pre-Trial Mem. at 2; *see* Rose Ann Amato Post-Trial Mem. at 3. In her Post-Trial brief, Rose Ann claims that "the oral agreement/modification was only discussed by [Judge] Platt in the context of whether the Agreement was ambiguous and whether the terms of the oral agreement should be used to assist in the meaning of the Agreement." Rose Ann Amato Post-Trial Mem. at 3 n. 1. Similarly, at trial, Defendants' counsel argued that Judge Platt's ruling did not reach the issue of damages, and that damages should be reduced by the amount to which Plaintiff purportedly agreed would be reimbursed to Defendants. Tr. 21. [20]

The Court has reviewed Judge Platt's decision on Plaintiff's motion for partial summary judgment and finds that it fully resolved Plaintiff's breach of contract claim. *Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Jan. 12, 2012) [DE 111]. The reason, in part, is because, contrary to

---

[20] Alternatively, Defendants' counsel argued at trial for the first time that Rose Ann should be reimbursed for the care she personally provided her mother after the stroke, and moved the Court to add the affirmative defense of compensation for personal services. Tr. 434-435. The Court denied Defendants' application, finding that this claim constituted an affirmative defense which was not timely asserted under Fed. R. Civ. P. 15, 16. *See* Tr. 438-439.

Defendants' contention, the very same arguments advanced in Defendants' pre- and post-trial briefs were asserted in Defendant Rose Ann Amato's opposition to Plaintiff's motion for summary judgment. *See* Def. Rose Ann Amato's Opp'n to Pl.'s Mot. for Partial Summary Judgment [DE 103], at 8-12. Specifically, Rose Ann argued there that: (i) a verbal agreement is enforceable even when there is a written agreement between the parties containing a merger clause, when the subject matter of the verbal agreement does not contradict or modify the terms of the written agreement;[21] (ii) the alleged verbal agreement between Rose Ann and Plaintiff authorizing Rose Ann to deduct any amount she expended for the care of Anna Perrone does not contradict or modify the terms of the written Agreement; (iii) Plaintiff conceded that genuine factual issues existed regarding whether the Agreement was modified by the parties' agreement to reimburse Rose Ann; and (iv) the terms of the Agreement do not prohibit oral modification, and evidence of such oral modification requires that summary judgment be denied. *Id.* at 10-11.

Judge Platt's decision clearly addressed these arguments, which are identical to those advanced in Defendants' pre- and post-trial briefs, and is worth quoting here:

> The Court finds the Agreement is unambiguous. When reading the terms of contract, a reasonable reader could not find that the parties' assent to this written agreement intended anything but what is written clearly: Rose Ann Amato would gain title to the Home and Anna Perrone would retain a life interest; at Anna Perrone's death or the sale of the Home, Rose Ann Amato would give Plaintiff a one-half interest in the Home or pay Plaintiff the monetary equivalent after the sale. The Court cannot imagine a more unambiguous agreement. No reasonable fact-finder could find that the Agreement means anything other than that.
>
> Rose Ann Amato contends the parties agreed to oral modifications wherein Plaintiff agreed th[at] Rose Ann Amato would reimburse [herself] for Anna Perrone's care; this reimbursement would be

---

[21] The Court points out that after making this argument, Defendants' counsel then asserted that there was no merger clause in the written Agreement. Rose Ann Amato Post-Trial Mem. at 17.

> funded from the proceeds of the Home's sale, prior to remitting to Plaintiff his share. *See, e.g.* Defs.' Mem. L. Opp'n Pl.'s Mot. Summ. J. 8-12. Because the Court finds, as a matter of law, that the Agreement is unambiguous, "resort to extrinsic evidence is inadmissible to vary the writing." *Nachem*, 918 N.Y.S.2d at 490. The Court cannot write terms into the Contract. *See Brands*, 587 N.Y.S.2d at 700.
>
> In sum, the Court finds, therefore, a valid contract was executed by the parties and remained in force at the time of the Home's sale.

*Id.* at 12. Judge Platt, therefore, clearly considered Defendants' argument that Plaintiff's damages should be offset due to the alleged oral modification, but rejected that argument. *Id.* Judge Platt concluded that Plaintiff was entitled to judgment as a matter of law, and that therefore Plaintiff should be awarded one-half of the net proceeds, plus interest, of the sale of the home. *Id.* at 13.[22]

Judge Platt clearly considered the same arguments Defendants advanced here during the trial and in their pre- and post-trial briefs and found that Plaintiff is entitled to the full value of one-half of the net proceeds of the Premises, plus interest, without any offsets for Defendants' alleged expenditures. Under the "law-of-the-case doctrine, a court has discretion to re-examine an issue in certain circumstances." *Public Employees Retirement Association of New Mexico v. PriceWaterhouse Coopers LLP*, No. 07-3756-cv, 2009 WL 27704, at * 3 (2d Cir. Jan. 6, 2009). However**,** "[c]ourts are understandably reluctant to reopen a ruling once made, especially when

---

[22] Judge Platt also noted that *additional* funds that might be owed to Plaintiff were not part of the Court's order, and that all other funds potentially owed to Plaintiff must be proven at trial. *Id.* The only outstanding funds contemplated by Judge Platt were therefore *additional* funds potentially owed to Plaintiff, not offsets of the amount owed to Plaintiff under the Agreement. *Id.* Although not specifically referred to in Judge Platt's Order as such, these additional funds are likely Plaintiff's claim to the monies withdrawn from the reverse mortgage line of credit. Although Plaintiff appears to argue that these funds are owed to him under his breach of contract cause of action (*see* SAC ¶¶ 78, 81), the Court finds that any claim to these funds is more appropriately addressed as part of Plaintiff's damages for fraudulent conveyance, fraud, and conspiracy.

one judge or court is asked to consider the ruling of a different judge." *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008)   A court's decision whether to apply law-of-the-case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.*, 168 F. 3d 593, 607 (2d Cir. 1999) (internal quotation marks omitted).

With regard to law-of-the-case doctrine, the Second Circuit has noted that

> [t]he law of the case doctrine . . . while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 547 F.3d 109, 112 n. 3 (2d Cir. 2008) (citing *Ali v. Mukasey*, 529 F.3d at 490)**.**   I find that the law-of-the-case doctrine applies in the current circumstances.   Defendants have not provided any argument or rationale here that there has been some "intervening development of law or fact that renders reliance on [Judge Platt's] earlier ruling inadvisable." *Calabrese v. CSC Holdings, Inc.*, No. 02-CV-5171, 2009 WL 425879, at * 6 (E.D.N.Y. Feb. 19, 2009).   The law of the case will be disregarded "only when the court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt*, 668 F. 2d 100, 109 (2d Cir. 1991) (quoting *Zdanok v. Glidden*, 327 F. 2d 944, 953 (2d Cir. 1964)).   Here, Defendants present no new evidence or facts to serve as any reasonable justification for Defendants' prior conduct or any basis whatsoever to disturb Judge Platt's prior rulings.   Consequently, this Court will not disturb Judge Platt's rulings. *See Reiseck*, 2012 WL 3642375, at *2; *Sankar*, 2012 WL 2923236, at *1;

*Faiveley*, 2011 WL 1899730, at *4; *NIC Holding Corp.*, 2009 WL 996408, at *2; *United States Underwriters Ins. Co.*, 2006 WL 3146422, at *2-3.

The parties have stipulated that Plaintiff's interest in one half of the net proceeds of the sale of the Premises amounted to $134,766.02.  SF 50.  Therefore, Plaintiff is entitled to $134,766.02 in damages on his breach of contract claim, plus pre-judgment interest, as set forth in Section II(E)(1), *supra*.

### C.    Choice of Law

As noted, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Defendants argue that Florida law should apply to Plaintiff's fraudulent conveyance claims.[23] *See* Defs.' Pre-Trial Mem. at 8 n.1; Rose Ann Amato Post-Trial Mem. at 19, 20 n.4.  However, Defendants analyze Plaintiff's conspiracy, fraud, constructive trust, and tortious interference claims under New York law principles, and do not assert that Florida law should apply to these claims.  *See* Defs.' Pre-Trial Mem. at 6-7, 10-12; Rose Ann Amato Post-Trial Mem. at 16-18, 21-25.  Plaintiff applies New York law to all of his claims, and does not address Defendants' argument that Florida law should apply to his claims for fraudulent conveyance.  *See* Pl.'s Post-Trial Mem. at 8-25.

In general, New York choice of law principles apply in this diversity action.  *See, e.g., In re Coudert Bros.* LLP, 673 F.3d 180, 186 (2d Cir. 2012) ("When a federal district court sits in diversity, it generally applies the law of the state in which it sits, including that state's choice of

---

[23]    It appears that Defendants raise the choice of law issue for the first time in their pre- and post-trial briefs.  Accordingly, choice of law was neither addressed in Judge Platt's decision on Plaintiff's motion for partial summary judgment (*Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Jan. 12, 2012)) [DE 111] nor in Judge Platt's decision on the motion to dismiss brought by Defendant Jack Amato and former Defendant Jack's Pizzeria (*Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010)) [DE 78].  Those decisions assumed New York law applied.

law rules) (citing *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *see also Opulen Ventures, Inc. v. Axcessa, LLC*, No. 12-CV-01776,  2013 WL 829230, at *1 (E.D.N.Y. Jan. 22, 2013) ("A federal court sitting in diversity must look to the choice of law rules of the forum state in order to determine the appropriate choice of law, here, New York.") (citing *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 11 F.3d 130, 134 (2d Cir. 1997)).

"Under New York choice of law rules, where both parties agree as to the applicable law, that agreement is sufficient to establish choice of law." *Ashbaugh v. Windsor Capital Grp., Inc.*, 10 CIV. 4647, 2012 WL 2319240, at *3 n.2 (E.D.N.Y. June 19, 2012)) (citing *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011)); *Excelsior Capital LLC v. Allen*, No. 11 Civ. 7373, 2012 WL 4471262, at *9 (S.D.N.Y. Sept. 25, 2012).  Even where there is no formal agreement establishing choice of law, where "[t]he parties' briefs assume New York law controls, 'implied consent … is sufficient to establish choice of law.'" *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 137 (2d Cir. 2000) (quoting *Tehran-Berkeley Civil & Environmental Engineers v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)); *see Federal Ins. Co. v. American Home Assur. Co.*, 639 F.3d 557, 567-68 (2d Cir. 2011) (finding New York law applied in diversity action brought in New York because law of forum controlled where neither party raised choice of law issue on appeal); *Herzfeld v. JPmorgan Chase Bank, N.A.*, 354 Fed. App'x 488, 489 (2d Cir. 2009) (finding New York law applied in diversity action where the parties assumed that New York law governed); *Spa 77 G L.P. v. Motiva Enterprises LLC*, 772 F. Supp. 2d 418, 427 n. 5 (E.D.N.Y. 2011) (noting that New York law applied where the parties relied upon New York law in their briefs).

As noted, Defendants do not appear to argue that Florida law should be applied to Plaintiff's claims for conspiracy, fraud, constructive trust, and tortious interference, or that a relevant conflict exists between Florida and New York law with respect to these causes of action. Plaintiff also applies New York law to these claims. Therefore, the Court applies New York law to these claims. *See Ashbaugh*, 2012 WL 2319240, at *3 n.2; *Excelsior Capital*, 2012 WL 4471262, at *9; *Krumme*, 238 F.3d at 137; *Federal Ins. Co.* 639 F.3d at 567-68; *Herzfeld*, 354 Fed. App'x at 489; *Spa 77*, 772 F. Supp. 2d at 427 n. 5.

Under New York choice-of-law rules, where the parties dispute which state's law should apply, a court must first determine whether there is a substantive conflict between the laws of the relevant choices. *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (citing *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 957 N.Y.S.2d 904, 613 N.E.2d 936 (1993)); *Kwiecinski v. John K. Renke II. Law Office*, No. 11-CV-2246, 2012 WL 4344589, at *4 (E.D.N.Y. July 30, 2012). "In the absence of a substantive difference … a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citing *J. Aron & Co. v. Chown,* 231 A.D.2d 426, 647 N.Y.S.2d 8 (N.Y. App Div. 1996) (affirming application of New York law where there was no actual conflict with the substantive law of Newfoundland); *Tronlone v. Lac d'Amiante Du Quebec,* 297 A.D.2d 528, 528, 747 N.Y.S.2d 79 (2002), *aff'd* 99 N.Y.2d 647, 760 N.Y.S.2d 96, 790 N.E.2d 269 (2003) (affirming application of New York law where there was no relevant conflict between the substantive laws of New York and New Jersey)).

Defendants argue that Florida law should apply to Plaintiff's fraudulent conveyance claims. *See* Defs.' Pre-Trial Mem. at 8 n.1; Rose Ann Amato Post-Trial Mem. at 19, 20 n.4. Here, a bit of background is helpful. Plaintiff's fraudulent conveyance claims under the DCL relate to three transactions: (1) Rose Ann Amato's transfer of 90% of her shares of capital stock in Jack's Pizzeria to Defendant Jack Amato; (2) Rose Ann Amato's deposit of the $267,032.03 net proceeds into the joint bank account in the name of Rose Ann Amato and Jack Amato; and (3) Rose Ann Amato's diversions from the reverse mortgage for the benefit of Jack Amato and Jack's Pizzeria. Pl.'s Post-Trial Mem. at 14-15. Defendants argue in a footnote that "[b]ecause the subject conveyances occurred in Florida, the law of Florida may control." Defs.' Pre-Trial Mem. at 8 n.1. Rose Ann Amato Post-Trial Mem. at 19, 20 n.4. Further, Defendants contend that "Florida law is not as expansive as the Debtor and Creditor Law of New York, and requires proof of actual fraud." Defs.' Pre-Trial Mem. at 8 n.1; Rose Ann Amato Post-Trial Mem. at 19, 20 n.4.

Defendants do not offer any further comparison of Florida law and the DCL or even state what specific Florida statue might apply. Rather, Defendants cite *RCA Corp. v. Tucker*, 696 F. Supp. 845, 852 (E.D.N.Y. 1988), to support their proposition that "Florida law" requires proof of actual fraud, while the DCL does not. In that case -- a turnover proceeding -- the court considered whether a judgment debtor's transfer to his wife of a promissory note, which represented a debt owed to the judgment debtor, was fraudulent as to New York creditor plaintiffs. *Id.* at 848-849. There, the judgment had already been entered in plaintiffs' favor in the amount of $1.3 million. *Id.* at 848. The court considered a choice of law argument with respect to New York's DCL §273(a) and Florida's Civil Practice and Procedure Law

§56.29(6)(a).  Both of these statutes apply only in the context where a final judgment for the plaintiff has already been entered and the defendant fails to satisfy the judgment.  Those are not the circumstances here, nor does Plaintiff allege a cause of action under DCL § 273(a).  Nor has this Court found any relevant Florida statute requiring a plaintiff to prove "actual fraud" in a cause of action for fraudulent conveyance.  Rather, under Florida's fraudulent transfer statute:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith **actual intent to hinder, delay, or defraud** any creditor of the debtor.

FLA. STAT. § 726.105(1) (2013) (emphasis supplied); *see also Euro RSCG Direct Response, LLC v. Green Bullion Financial Services*, 872 F. Supp. 2d 1353, 1362 (S.D. Fla. 2012).  Here, the statute requires not "actual fraud" but "***actual intent to hinder, delay, or defraud*** . . . ."  FLA. STAT. § 726.105(1) (2013).  In determining "actual intent," consideration may be given, among other things, to whether:  (i) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; or (ii) [t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.  FLA. STAT. § 726.105(2)(d), (i) (2013).

The relevant sections of the DCL are similar to the Florida statute.  Section 276 of the DCL provides:

> Every conveyance made and every obligation incurred **with actual intent**, as distinguished from intent presumed in law, **to hinder, delay, or defraud** either present or future creditors, is fraudulent as to both present and future creditors.

N.Y. DEBT. & CRED. LAW § 276 (McKinney 2013) (emphasis supplied).  Under §276, as under Florida's statute, actual intent is necessary for a finding of liability.  *See id.*  Therefore, there is

no substantive difference between DCL § 276 and FLA. STAT. § 726.105(1).  As such, the Court

will apply New York law to these claims.  *See Int'l Bus.*, 363 F.3d at 143; *Tronlone*, 297 A.D.2d

at 528.

Section 273 of the DCL provides:

> Every conveyance made and every obligation incurred by a person
> who is or will be thereby rendered insolvent is fraudulent as to
> creditors without regard to his actual intent if the conveyance is
> made or the obligation is incurred without a fair consideration.

N.Y. DEBT. & CRED. LAW § 273 (McKinney 2013).  Here, actual intent is not required for a

finding of liability under Section 273.  To this Court's knowledge, there is no analogous Florida

statute dealing specifically with insolvency.  However, under Florida Statute § 726.105, whether

the debtor became insolvent after the transfer was made is considered proof of actual intent.

FLA. STAT. § 726.105(1)(i) (2013).  Whether the transfer was made after the debtor was sued is

also considered evidence of intent.  FLA. STAT. § 726.105(2)(i).  The analysis is therefore similar

under both Florida and New York law.  Since the Court finds that no relevant conflict exists

between the laws of New York and Florida, New York law governs these claims.  *See Int'l Bus.*,

363 F.3d at 143; *Tronlone*, 297 A.D.2d at 528.

Further, the Court notes that, even if the DCL and Florida law were found to be in

conflict, New York law would still apply.  Under New York's "interest analysis," the Court

applies the law of the jurisdiction with the greatest interest in the litigation, examining

"significant contacts" such as the parties' domiciles and the locus of the tort.  *GlobalNet*, 449

F.3d at 384; *Prime Mover Capital Partners, L.P. v. Elixir Gaming Technologies, Inc.*, 793 F.

Supp. 2d 651, 673 (S.D.N.Y. 2011).  Based on the facts here, New York has the most significant

contacts with Plaintiffs' claims.  Plaintiff is a resident of New York, and Defendants, although

current residents of Florida, were also New York residents during some of the events underlying this litigation.  The reverse mortgage line of credit was opened in New York, and these funds were deposited in a New York bank account for the majority of the life of the line of credit (April 2006 to March 2008).  Further, the Premises was located in New York and the closing occurred in New York.  The Court also notes that the DCL may be given extraterritorial application, even where transfers occurred outside of New York State.  *See Eclair Advisor Ltd. as Trustee to Daewoo Int'l (America) Corp. Creditor Trust v. Daewoo Engineering and Construction Co., Ltd.*, 375 F. Supp. 2d 257, 268 n. 4 (S.D.N.Y. 2005) ("Defendant's additional contention that New York Fraudulent Conveyance Statute ought not to be given extraterritorial application is unfounded.") (citing *Advanced Porftolio Techs., Inc.,* No. 94 Civ. 5620, 1996 WL 51190, at *5-7 (applying DCL to conveyances that occurred in England) ; *Elgin Sweeper Co. v. Melson, Inc.,* 884 F.Supp. 641, 649-50 (N.D.N.Y. 1995) (applying DCL to conveyances that occurred in Canada)).

Finally, the Court notes that even where a complaint does not specify facts which enable a court to make a choice of law determination with any certainty, the Court may apply the law of the forum.  *See Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, at 193, n.14  (E.D.N.Y. 2009) (where allegations in the complaint were not specific enough to enable choice of law determination with any certainty, the court assumed the law of New York applied because plaintiffs chose to bring their action in New York); *Prime Mover Capital Partners, L.P. v. Elixir Gaming Technologies, Inc.*, 793 F. Supp. 2d 651, 673 (S.D.N.Y. 2011) (where the facts alleged in the complaint were "not adequate to determine with any degree of certainty" which state had the strongest interest in plaintiffs' tort claims, the court applied "the

law of the forum specifically chosen by the plaintiffs—that is, New York.") (citing *Conceria Vignola SRL v. AXA Holdings, LLC*, No. 09 Civ. 6684, 2012 WL 3377476, at *3 (S.D.N.Y. Aug. 3, 2010) (applying forum law where plaintiff's allegations did not clearly establish the "center of gravity" of the parties' contract); *Bravado*, 655 F. Supp. 2d at 193 n.14.)).

Based on the foregoing, the Court applies New York law to all of Plaintiff's remaining claims.

### D.   Analysis of Plaintiff's Remaining Claims

#### 1.   *Fraudulent Conveyance under DCL Section 276*

As noted, Plaintiff's fraudulent conveyance claims under the DCL relate to three types of transactions: (1) Rose Ann Amato's deposit of the $267,032.03 net proceeds into the joint bank account of Rose Ann and Jack Amato; (2) Rose Ann Amato's diversions from the reverse mortgage line of credit; and (3) Rose Ann Amato's transfer of 90% of her shares of capital stock in Jack's Pizzeria to Defendant Jack Amato.  SAC ¶¶ 82-111.  Pl.'s Post-Trial Mem. at 14-15.

As noted, Section 276 of the DCL provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

N.Y. DEBT. & CRED. LAW § 276 (McKinney 2013).  As an initial matter, to have standing under § 276, the Plaintiff must be a present or future creditor of the transferor.  *See Eberhard v. Marcu*, 530 F.3d 122, 129 (2d Cir. 2008) ("It is well settled that in order to set aside a fraudulent conveyance, one must be a creditor of the transferor; those who are not injured by the transfer lack standing to challenge it."); *see* N.Y. DEBT. & CRED. LAW § 270 (McKinney 2013) (defining creditor as "a person having any claim, whether matured or unmatured, liquidated or

unliquidated, absolute, fixed or contingent"). Judge Platt previously determined that Plaintiff had standing to sue as a creditor for the alleged fraudulent conveyances at issue here. Specifically, in Judge Platt's Order on the motion to dismiss brought by Defendant Jack Amato and former Defendant Jack's Pizzeria, Judge Platt found that

> a creditor is defined as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y. Debt. & Cred. Law § 270. Moreover, "[u]nder New York's broad definition of 'creditor,' one who has a right to maintain a tort action but has not recovered judgment at the time of the transfer is a creditor, and it is now accepted that the relationship of debtor and creditor [in tort cases] arises the moment the cause of action accrues. *Drenis*, 452 F. Supp. 2d at 428 (citations and internal quotation marks omitted). When Plaintiff signed the contract with Rose Ann Amato—and upon the transfer of the Home's title to her—he received rights in that Home and the proceeds therefrom. This gave him "creditor" status. Further, Plaintiff has alleged that his share of the proceeds was diminished as a result of Rose Ann's transfers. Moreover, the reverse mortgage on the Home, if abused, stripped the Home of equity. Thus, any alleged misappropriation of those funds would damage Plaintiff's vested interest in the Home.

*Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) [DE 78] at 25.

Further, to successfully allege a claim under § 276, Plaintiff need not prove lack of consideration; however, Plaintiff must prove actual intent to hinder, delay or defraud. *See In re Sharp Intern. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). Where actual intent to hinder, delay or defraud creditors is proven, "the conveyance will be set aside regardless of the adequacy of consideration given." *In re Sharp Intern*, 403 F.3d at 56 (citing *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994)). Further, only an actual intent to hinder and delay need be established, not an actual intent to defraud. *In re Allou Distributors, Inc.*, 446 B.R. 32, 61 (Bankr. E.D.N.Y. 2011); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374, (S.D.N.Y. 2003); *affirmed Lippe v. Bairnco Corp.*, 99 Fed. App'x 274 (2d Cir. 2004); *Atlanta Shipping Corp., Inc.*

*v. Chem. Bank*, 818 F.2d 240, 252 (2d Cir. 1987) ("Though DCL § 276 is triggered by an actual intent to hinder, delay, or defraud, all three [of those] means of damaging creditors are within a general category that the statute categorizes as 'fraudulent.'")) (internal citations omitted).

"The burden of proving 'actual intent' is on the party seeking to set aside the conveyance." *In re Sharp Intern.*, 403 F.3d at 56 (citing *McCombs*, 30 F.3d at 38); *see Kreisler Borg Florman General Const. Co., Inc. v. Tower 56, LLC*, 58 A.D.3d 694, 872 N.Y.S.2d 469 (2d Dep't 2009) ("The burden of proof to establish actual fraud under Debtor and Creditor Law § 276 is upon the creditor who seeks to have the conveyance set aside. . . .") (citations omitted). However, due to the difficulty of proving actual intent to hinder, delay, or defraud, a plaintiff may rely on circumstantial evidence or "badges of fraud" to support his case, *i.e.*, "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *In re Sharp Intern*, 403 F.3d at 56; *see Cadle Co. v. Newhouse*, 74 Fed App'x 152, 153 (2d Cir. 2003); *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 293-94 (E.D.N.Y. 2012); *Aaron v. Mattikow*, 225 F.R.D. 407, 413 (E.D.N.Y. 2004) ("The petitioner is not required to establish actual intent 'to hinder, delay, or defraud ... present or future creditors' by direct evidence, which is rarely available. . . . Instead, the Court may infer fraud from the circumstances surrounding the transaction, commonly referred to as the 'badges of fraud.'") (quoting *Hassett v. Goetzmann*, 10 F. Supp. 2d 181, 188 (N.D.N.Y. 1996)).  These may include, *inter alia*: (1) a close relationship between the parties to the alleged fraudulent transaction; (2) a questionable transfer not in the usual course of business; (3) inadequacy of consideration for the alleged fraudulent transfer; and (4) retention of control of the property by the transferor after the conveyance.  *In re Sharp Intern*, 403 F.3d at 56 (citing *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247

(1st Dep't 1999)); *see Cadle Co.*, 74 Fed App'x at 153 (citing *RTC Mortgage Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 192, 201 (S.D.N.Y. 2001); *Friedman*, 848 F. Supp. 2d at 294 (citing *Eclaire Advisor Ltd. as Trustee to Daewoo Int'l (Am.) Corp. Creditor,* 375 F.Supp.2d 257, 268-69 (S.D.N.Y. 2005)).

Further, as Judge Platt stated in his Order denying Defendant Jack Amato's motion to dismiss Plaintiff's fraudulent conveyance claims, "transfers among family members raise special concerns, and receive different scrutiny." *Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) [DE 78] at 24 (citing *In re Jacobs*, 394 B.R. 646, 661 (Bankr. E.D.N.Y. 2008)). The suspicious timing of transactions, including whether they occured after the debt had been incurred or a legal action against the debtor had been threatened, may also be considered as a "badge of fraud" giving rise to an inference of intent. *See Friedman*, 848 F. Supp. 2d at 294 (citing *Eclaire Advisor*, 375 F. Supp. 2d at 268-69); *accord Aaron*, 225 F.R.D. at 413 (noting "badges of fraud" circumstances include "suspicious timing of the transfers or transfers that are unusual or hasty"). With these principles in mind, the Court considers Plaintiff's claims for fraudulent conveyance under DCL § 276.

### a. Proceeds from the Sale of the Premises

Plaintiff argues that, in general,

> the transfers by Rose Ann Amato to Jack Amato were made at a time when Rose Ann Amato knew she was indebted to Plaintiff under the Agreement, were made without fair consideration to a close family member to wit, her husband, were not made in the usual course of business, resulted in control over the transferred assets by Jack Amato and thus bear classic "badges of fraud."

Pl.'s Post-Trial Mem. at 16. With specific respect to the proceeds from the sale of the Premises, Plaintiff states the following:

On June 23, 2008, Rose Ann Amato received solely in her name the $267,032.03 in net proceeds from the sale of the Premises. She placed those net proceeds in joint accounts in the name of Rose Ann Amato or Jack Amato. There was no consideration for these transfers.

*Id.* at 14. Plaintiff argues that, because the proceeds of the sale of the Premises were deposited in Defendants' joint bank account, this constituted a conveyance from Defendant Rose Ann Amato to Defendant Jack Amato. *Id.* at 14.

Defendants acknowledge that the proceeds from the sale of the Premises were deposited into Defendants' joint bank account. Tr. 254. However, Defendants maintain that the bank account where the funds were deposited was held under Florida law as tenants by the entirety, and that Rose Ann "thereby had and has an interest in the entirety of the money allegedly conveyed, and there is therefore no conveyance within the meaning of the statute." Defs.' Pre-Trial Mem. at 8-9 (citing *Kozyra v. Goldstein*, 146 Misc.2d 25, 27 550 N.Y.S.2d 229, 230-31 (N.Y. Sup. Suffolk Co. 1989) (noting that unlike other forms of ownership, tenants by the entirety do not hold partial interest: each owns the whole subject to the parallel right of his or her spouse)).

Defendants' assertion that there was no conveyance because the account was held as a tenancy by the entirety is misplaced. "Under Florida law, a creditor of a single spouse may not execute a judgment on a joint bank account held as tenants by the entirety." *Benninghoff v. Potter*, No. 3:10-cv-1113, 2011 WL 3348079, at *1 (M.D. Fla. Aug. 3, 2011) (citing *In re Canovas,* No. 05–44854, 2009 WL 2386062, at *1 (Bankr. S.D. Fla. July 31, 2009)); *In re Sinnreich,* 391 F.3d 1295, 1297 (11th Cir. 2004) (discussing the Supreme Court of Florida's determination that "[w]hen property is held as a tenancy by the entireties, only the creditors of

both the husband and wife, jointly, may attach the tenancy by the entireties property; the property is not divisible on behalf of one spouse alone, and therefore it cannot be reached to satisfy the obligation of only one spouse.") (quoting *Beal Bank SSB v. Almand & Assoc*., 780 So.2d 45, 53 (Fla.2001)); *In re Sherwin,* 388 B.R. 411, 415 (Bankr. S.D. Fla. 2008) ("Under Florida law, a creditor cannot reach property held as tenants by the entireties to satisfy the individual debt of one spouse.").  Furthermore, New York Courts recognize fraudulent conveyances involving the transfer of property or assets to tenants by the entirety.  *HSH Nordbank AG New York Branch v. Street*, No. 11 Civ. 9405, 2012 WL 2921875, at *2 (S.D.N.Y. July 18, 2012) (discussing fraudulent conveyance claim where defendant allegedly transferred funds from a bank account held with his wife as joint tenants to an account with his wife held as tenants by the entirety); *Neshewat v. Salem*, 365 F. Supp. 2d 508, 520-21 (S.D.N.Y. 2005) (noting that "where a debtor purchases or owns real property and later causes title to be conveyed to himself and his wife as a tenancy by the entirety, the transfer may be set aside by a creditor if it was made without consideration"); *Clarkson Co. Ltd. v. Shaheen*, 533 F. Supp. 905, 924 (D.C.N.Y. 1982) (where husband transferred real property to wife as tenants by the entirety, court found that husband fraudulently conveyed the property to his wife for no consideration to evade his creditors; however, this fraudulent conveyance permitted a sale of the husband's interest in the property).

Plaintiff has already been found to be a creditor of Rose Ann.  Therefore, assuming the joint account was held by Defendants as a tenancy by the entirety as they assert,[24] Plaintiff as a

---

[24]   The Court notes that, under Florida law, there is a presumption that joint accounts held by spouses are held as tenants by the entirety. *See, Benninghoff v. Potter*, No. 3:10-cv-1113, 2011 WL 3348079, at *1 (M.D. Fla. Aug. 3, 2011).  This "presumption arises for bank accounts titled in the name of both spouses 'if the signature card of the account does not expressly disclaim the tenancy by the entireties form of ownership and so long as the account is established

creditor of Rose Ann Amato under the Agreement would be unable to execute judgment on the money in that account. *See Benninghooff*, 2011 WL 3348079, at *1; *Sherwin,* 388 B.R. 411, 415. Therefore, Rose Ann's deposit of those funds into the joint account with her husband constituted a conveyance. *See Benninghooff*, 2011 WL 3348079, at *1; *Sherwin,* 388 B.R. 411, 415; *see also HSH Nordbank AG*, 2012 WL 2921875, at *2; *Neshewat*, 365 F. Supp. 2d at 520-21; *Clarkson*, 533 F. Supp. at 924.

The question remains, however, whether the conveyance was made with actual intent to hinder, delay, or defraud Plaintiff. Under the "badges of fraud" test, the Court finds that Rose Ann Amato deposited the funds from the sale of the Premises into the joint account with her husband in order to "hinder, delay, or defraud" Plaintiff. The transaction at issue has a number of the badges of fraud outlined in the relevant precedents. The parties to the alleged fraudulent transaction have a close relationship: they are husband and wife. Jack Amato provided no consideration for the alleged fraudulent transfer. Further, Rose Ann retained control of the property after depositing it in the joint account. Although the deposit of funds into a joint marital account could be viewed as a type of transaction made in the regular course of business, the evidence shows that both Jack and Rose Ann Amato knew that under the Agreement, Plaintiff was entitled to half of the monies at issue. To cite just one telling example, when Plaintiff asked Rose Ann about his share of the proceeds from the sale of the Premises during a telephone conversation in the Fall of 2008, Rose Ann did not assert at that time that Plaintiff was not owed any of the funds based on Defendants' need to be reimbursed for Anna Perrone's care. Rather,

---

by husband and wife in accordance with the unities of possession, interest, title, and time with right of survivorship.'" *Id.* (quoting *Beal Bank*, 780 So. 2d at 58.). Although Defendants have not entered into evidence the signature card of the account or attested to the facts establishing the opening of the account, the Court is not aware of any evidence entered in this case which would refute Defendants' own assertions that the account was a tenancy by the entirety.

Rose Ann told the Plaintiff that she had to speak to her accountant regarding certain tax issues. *See* SF 53.

Significantly, Rose Ann had other accounts at her disposal in which to deposit the proceeds in June of 2008. Defendants' Exhibit B shows that the HSBC Account 4874 in Anna Perrone's name was open until at least October 2008. *See* Defs.' Ex. B (composite HSBC Bank Records) (including a check from HSBC Account 4874 of Anna Perrone, written to cash and signed by Rose Ann on October 31, 2008). As an attorney-in-fact of Anna Perrone, Plaintiff would have had access to any funds deposited into this account. Further, and more importantly, Defendants' Exhibit B shows that Rose Ann's HSBC Account 8600 with Plaintiff Joseph Perrone was open in June 2008, when Rose Ann deposited the proceeds of the sale of the Premises in the joint HSBC Account 3494 maintained by her and her husband Jack Amato. *See* Defs.' Ex. B. The cover letter to Defendants' Exhibit B indicates that this joint account was open in August 2008. *Id.* The records also illustrate that Rose Ann apparently closed this account on August 12, 2008, and transferred the remaining monies into another of her HSBC accounts (HSBC Account 8162). Defs.' Ex. B. (HSBC Account 8162 document dated August 8, 2012). Significantly, Rose Ann could have deposited the funds from the sale of the Premises into the joint account with her brother, allowing Plaintiff to easily obtain his share of the proceeds. Instead, Rose Ann deposited the funds into her own account with her husband, and closed her joint account with Plaintiff less than two months later. All of this evidence contributes to the Court's finding that Rose Ann intended to "hinder, delay, or defraud" Plaintiff. Even if Rose Ann did not intend to defraud her brother of the proceeds of the sale of the

Premises when she made the deposit, the foregoing circumstances, at a minimum, evidence an intent to hinder or delay Plaintiff's ability to obtain those funds.

Based on the evidence presented at trial and the relevant case law, the Court finds that Rose Ann's deposit of the funds from the sale of the Premises into the joint bank account with her husband constitutes a fraudulent conveyance. *See Sharp Intern*, 403 F.3d at 56; *Cadle Co.*, 74 Fed App'x at 153; *Friedman*, 848 F. Supp. 2d at 294.

### b. Funds from the Reverse Mortgage Line of Credit

The Court finds that Plaintiff has met his burden to prove a fraudulent transfer with respect to some (but not all) of the funds from the reverse mortgage line of credit. As noted, Judge Platt allowed Plaintiff's fraudulent conveyance claims to survive Defendants' motion to dismiss, indicating that Plaintiff has creditor status with respect to any funds fraudulently conveyed from the reverse mortgage on the Premises:

> When Plaintiff signed the contract with Rose Ann Amato—and upon the transfer of the Home's title to her—he received rights in that Home and the proceeds therefrom. . . . Moreover, the reverse mortgage on the Home, if abused, stripped the Home of equity. Thus, any alleged misappropriation of those funds would damage Plaintiff's vested interest in the Home.

*See Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) [DE 78] at 25. Plaintiff alleges that Rose Ann used funds from the reverse mortgage line of credit to pay (1) her own creditors, (2) the expenses of Jack's Pizzeria, and (3) the personal expenses of her husband, "including his personal betting with youbet.com, his credit card bills, mortgage payments on a home in Port St. Lucie, Florida, and homeowners' association dues for said home." SAC ¶ 101. Plaintiff alleges that these conveyances were made with the intent to hinder, delay or defraud Plaintiff of his equity in the Premises. SAC ¶ 102.

Plaintiff does not offer any specific damages calculation under this claim, either in the SAC or in his pre- or post-trial briefs. For example, Plaintiff does not specify whether he seeks damages with respect to his share of the $20,000 and $6,000 allegedly diverted from the reverse mortgage line of credit. Rather, Plaintiff discusses Defendants' "fraudulent transfers" only in general terms. *See, e.g.,* Pl.'s Post-Trial Mem. at 14 ("The diversions from the reverse mortgage for the benefit of Jack Amato and the Pizzeria were made without consideration and made without the knowledge of Joseph Perrone."). The Court notes that, as a general rule, fraudulent conveyance claims must be pled with specificity. *See, e.g., In re Sharp Intern. Corp.*, 403 F.3d 43, 55-56 (2d Cir. 2005); *Liberty Mut. Ins. Co. v. Hirzon Bus Co., Inc.*, 2011 WL 1131098, at *3 (E.D.N.Y. Feb. 22, 2011) (noting that DCL claim must be pled with specificity, including particulars as to the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent transactions, or the consideration paid) (collecting cases). Accordingly, the Court will consider only those transfers which were conveyed to Defendants' personal creditors or to Jack's Pizzeria.

The parties have stipulated that funds used for Defendants' personal purposes or for the benefit of Jack's Pizzeria from the accounts where the reverse mortgage monies were deposited totaled $47,401.44. *See* SF 63, 69. Based on the testimony presented at trial, the Court finds the requisite fraudulent intent for the transfer of these funds to Defendants' creditors and Jack's Pizzeria has been established. *See Federal Nat. Morg. Ass'n v. Olympia Morg. Corp.*, No. 02 CIV. 9807, 2006 WL 2802092, at *8-10 (E.D.N.Y. Sept. 28, 2006) (finding fraudulent transfers where closely-held corporation transferred funds to creditors of corporation's owner, including mortgage lenders, credit card companies, insurance companies, and others, for the payment of

debts); *In re Flutie New York Corp.*, 310 B.R. 31, 53-57 (Bankr. S.D.N.Y. 2004) (finding

fraudulent conveyance under DCL where company paid personal credit card bills, utilities, car

payments, and other personal expenses of company's principal); *In re Brosnahan*, 324 B.R. 199

(Bankr. W.D.N.Y. 2005) (finding plaintiff stated valid causes of action under the DCL related to

debtor's conveyance of mortgage line of credit funds to debtor's children); *In re Montclair*

*Homes*, 200 B.R. 84, 97 (Bankr. E.D.N.Y. 1996) (finding fraudulent conveyance under DCL 276

where defendant transferred assets to other corporate entities controlled by him and/or to banking

institutions to whom he owed money); *accord In re Parikh*, 456 B.R. 4, 34 (Bankr. E.D.N.Y.

2011) (finding fraudulent conveyance under bankruptcy statute where defendant depleted home

equity in the amount of $45,000 and transferred this money to his wife's account, where transfer

was made with fraudulent intent and where debtor owed plaintiff a significant amount of

money). Specifically, and based on the circumstantial evidence submitted at trial, the Court

finds that Defendants knew that Plaintiff was entitled to 50 % of the proceeds of the sale of the

Premises, and intentionally divested the Premises of equity to pay their own personal expenses

and the expenses of Jack's Pizzeria.[25] These fraudulent transfers were intended to "hinder,

delay, or defraud" Plaintiff of his vested interest in the proceeds of the sale of the Premises.

---

[25] The fact that Rose Ann holds a 10% interest in Jack's Pizzeria will not defeat Defendants' fraudulent conveyance claim, since Jack's Pizzeria is a legally distinct entity. *See, e.g., Amusement Industry Inc. v. Midland Avenue Associates, LLC*, 820 F. Supp. 2d 510, 520 (S.D.N.Y. 2011) (finding fraudulent transfer from one corporation to another, even where corporations were controlled by the same person, noting that "[a]ll that is logically required by the constructive fraudulent conveyance statutes is that the transfer be between two legally distinct entities. . . . It would be odd to disallow a set-aside of the transfer where the transferor had some beneficial interest in the transferee entity.").

### c. Transfer of Stock in Jack's Pizzeria

The Court finds that Plaintiff has not met his burden with respect to his claim that Rose Ann fraudulently conveyed her 90% interest in stock in Jack's Pizzeria to her husband. *See* SAC ¶¶ 83-94. The Court acknowledges that many of the classic badges of fraud are present with respect to this transfer. For example, the transfer occurred between a husband and wife, without consideration. *See* Tr. 251-252. Further, Plaintiff commenced this lawsuit on January 26, 2009 [DE 1], and the stock transfer occurred just a few months later, in July 2009. *Id.* The timing of the transfer is particularly suspicious, as it occurred shortly after the Plaintiff commenced this action. *See Friedman*, 848 F. Supp. 2d at 294; *Eclaire Advisor*, 375 F. Supp. 2d at 268-69.

However, Defendants have adequately rebutted any presumption of actual intent to which these badges of fraud may give rise. Defendants testified that Jack Amato was in fact the operator of Jack's Pizzeria and controlled the business. Tr. 361-362. As noted, Plaintiff does not appear to contest this claim. However, because of a prior criminal conviction in 1994, Defendants argue that Jack could not obtain a liquor license for the business until 15 years after the date of the criminal conviction. Tr. 19. Therefore, Defendants maintain, the shares of Jack's Pizzeria were held in Rose Ann's name until the expiration of the fifteen-year period, which coincidentally occurred shortly after Plaintiff commenced this lawsuit. *Id.*

Defendants entered into evidence the April 1, 2009 Certificate of Disposition from the U.S. District Court for the Southern District of New York, along with a certified copy of the docket entries for Jack Amato's case. Defs.' Ex. A (Certificate of Disposition, SDNY Docket Sheet for CR 93-1067). According to the docket sheet, Jack Amato was indicted on January 24, 1994 on four felony counts. Defs.' Ex. A (docket entry 2). On June 8, 1994, he pled guilty to

one count of federal extortion and racketeering.  Defs.' Ex. A (Electronic Docket Entry, June 8, 1994).  Amato was sentenced on November 9, 1994 to three years of probation.  Defs.' Ex. A (docket entry 163).

Further, Jack Amato testified that he owned and operated Amici's in New York up until the time of his criminal conviction.  Tr. 355-356.  However, because of his conviction, Jack Amato could not obtain a liquor license, so he was forced to transfer the stock in that restaurant to his wife.[26]  Tr. 293-294; 355-356.  Despite the fact that both Amici's and Jack's Pizzeria were in Rose Ann Amato's name, Rose Ann and Jack Amato testified consistently that Jack actually controlled and operated the business.  Tr. 343-345; 361-362.  The Court finds this aspect of their testimony credible.

Although Defendants have presented no evidence of the Florida statute prohibiting a convicted felon from obtaining a liquor license for 15 years after the date of his conviction, the Court finds that Defendants have submitted sufficient evidence to rebut any presumption of fraudulent intent Plaintiff asserted under the "badges of fraud" analysis.  The Court notes that Plaintiff does not contest or address in any way Defendants' reasonable explanation for the stock transfer.  Therefore, the Court finds that Plaintiff did not meet his burden to prove that Rose Ann's transfer of 90% of the stock in Jack's Pizzeria to her husband constitutes a fraudulent conveyance.

---

[26]  Jack Amato testified at trial that in order to obtain the liquor license he had to lie to the New York State liquor authority by signing a separation agreement stating that he and Rose Ann Amato were no longer living together.  Tr. 355-358.  While this testimony reflects negatively on Jack Amato's credibility in general, the Court must still consider whether Defendants presented credible evidence that rebuts any presumption of actual intent to "hinder, delay or defraud" Plaintiff with respect to the transfer of stock of Jack's Pizzeria.

### 2. *Fraudulent Conveyance under DCL Section 273*

Under Section 273 of the DCL, Plaintiff need not prove actual intent to "hinder, delay or defraud." Rather, Plaintiff must simply prove that the conveyance rendered the transferor insolvent and was made without fair consideration. N.Y. DEBT. & CRED. LAW § 273 (McKinney 2013); *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 117 (E.D.N.Y. 2012); *Gasser v. Infanti Intern., Inc.*, 353 F. Supp. 2d 342, 354 (E.D.N.Y. 2005) ("A claim under DCL § 273 does not require proof of an intent to deceive or any of the traditional elements of fraud.") (internal citations and quotations omitted). "A person is insolvent when the present fair stable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. DEBT. & CRED. LAW § 271(1) (McKinney 2013). Therefore, in order to succeed under this Section, Plaintiff must show that (1) a transfer occurred (2) while Rose Ann was insolvent, or that the transfers rendered Rose Ann insolvent, and (3) that the transfers were not made in exchange for fair consideration. *See Olympia*, 2011 WL 9933496, at *8; *In re Boriello,* 329 B.R. 367, 373 (Bankr. E.D.N.Y. 2005); *Flutie*, 310 B.R. at 53 (Bankr. S.D.N.Y. 2004).

The burden of proving insolvency and lack of fair consideration is generally on the party challenging the conveyance. *First Keystone*, 871 F. Supp. 2d at 120 (citing *United States v. Alfano*, 34 F. Supp. 2d 827, 845 (E.D.N.Y. 1999); *Gasser*, 353 F. Supp. 2d at 354. However, when a conveyance is made without fair consideration, the element of insolvency is presumed, and the burden of overcoming such presumption is on the transferee. *First Keystone*, 871 F. Supp. 2d at 120; *Olympia*, 2011 WL 9933496, at *8 (citing *Alfano,* 34 F. Supp. 2d at 845); *Gasser*, 353 F. Supp. 2d at 354. Defendants may only rebut the presumption by proving

continued solvency after the date of the transfer.  *Id.* (citing *Flutie*, 310 B.R. at 54).  In the case

of an intra-family transfer, the burden of proving the lack of fair consideration also shifts to the

transferee.  *Olympia*, 2011 WL 9933496, at *8; (citing *United States v. McCombs,* 30 F.3d 310,

324–326 (2d Cir. 1994); *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 332

(E.D.N.Y. 2009).  The determination of whether fair consideration is received in exchange for a

transfer is a question of fact.  *Olympia*, 2011 WL 9933496, at *8 (citing *Eclaire Advisor*, 375 F.

Supp. 2d at 269 n. 5; *Am. Tissue v. Donaldson,* 351 F.Supp.2d 79, 105–06 (S.D.N.Y. 2004)).  In

order to satisfy the statutory requirement for "fair consideration" under § 273, a conveyance

must satisfy an antecedent debt or constitute a present exchange.  *Olympia*, 2011 WL 9933496,

at *8 (citing *HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1061 (2d Cir.1995)).  If the transferee

to an intra-family transfer cannot prove fair consideration, he must prove continued solvency

after the transaction.  *See, e.g., DLJ Mortg.*, 594 F. Supp. 2d at 332.

Plaintiff's fraudulent conveyance claims under DCL 273 fail because (i) some of the

transfers were made in exchange for fair consideration; and (ii) Defendants' have produced

evidence that Rose Ann was not rendered insolvent by the transfers.  With respect to the funds

conveyed from the reverse mortgage line of credit for the payment of Rose Ann's own personal

debts, the debts of Jack Amato, and the business expenses of Jack's Pizzeria, the Court finds that

Rose Ann's payment of her own personal credit card bills, mortgage and other similar expenses

were made in exchange for fair consideration, *i.e.*, the satisfaction of her debts.  *See Olympia*,

2011 WL 9933496, at *8; *HBE Leasing Corp.,* 61 F.3d at 1061.  Further, the payments for the

benefit of Jack's Pizzeria were also supported by fair consideration, *i.e.*, contracting work

benefitting the business.  Therefore, these payments were made in exchange for fair

consideration.  However, expenses paid to satisfy the personal debts and expenses of Jack Amato constitute intra-familial transfers.  Moreover, Defendants have not proved that Rose Ann received fair consideration for these transfers, *i.e.*, that these transfers were made to satisfy an antecedent debt or constitute a present exchange.  *See Olympia*, 2011 WL 9933496, at *8; *HBE Leasing Corp. v. Frank,* 61 F.3d at 1061.  Because the Defendants have offered no evidence that fair consideration was provided for this transfer, the presumption arises that the transfer rendered Rose Ann insolvent.  *See First Keystone*, 871 F. Supp. 2d at 120; *Olympia*, 2011 WL 9933496, at *8; *Alfano,* 34 F. Supp. 2d at 845.

With respect to the sale of the Premises, Rose Ann transferred the proceeds from the sale of the Premises to the joint bank account with her husband.  This transfer constitutes an intra-family transfer; therefore, it is Defendants' burden to show that consideration was provided for the transfer.  *Olympia*, 2011 WL 9933496, at *8; *McCombs,* 30 F.3d at 324–326; *DLJ Mortg.*, 594 F. Supp. 2d at 332.  Defendants have not shown that consideration was provided for this transfer.  Because the Defendants have offered no evidence that fair consideration was provided for this transfer, the presumption arises that the transfer rendered Rose Ann insolvent.  *See First Keystone*, 871 F. Supp. 2d at 120; *Olympia*, 2011 WL 9933496, at *8; *Alfano,* 34 F. Supp. 2d at 845.

Similarly, the 90% transfer of stock in Jack's Pizzeria by Rose Ann Amato to Jack Amato constitutes an intra-familial transfer.  Rose Ann stated on the record that Jack did not pay her anything for the transfer in shares of stock.  Tr. 252.  Defendants have not otherwise provided any evidence that fair consideration was paid for this transfer.  Therefore, because the Defendants have offered no evidence that fair consideration was provided for this transfer, the

presumption arises that the transfer rendered Rose Ann insolvent. *See First Keystone*, 871 F. Supp. 2d at 120; *Olympia*, 2011 WL 9933496, at *8; *Alfano,* 34 F. Supp. 2d at 845.

However, Rose Ann has presented evidence to rebut the presumption that any of these conveyances resulted in her insolvency. For example, during the trial, Defendant's counsel referenced Exhibit 29, containing Bank of America records for various of Defendants' bank accounts. *See* Ex. 29. It appears that two nine-month risk-free CDs were opened in the name of Rose Ann Amato alone in June 2008, with opening deposits of $122,107 and $144,925. *See* Ex. 29. Thus, Defendants have presented records of continued solvency. Plaintiff does not address these documents in his post-trial brief, but merely states that Defendants did not put in evidence any records showing their assets or liabilities. Pl.'s Post-Trial Mem. at 19. Because the Court finds that Defendants have provided support to rebut the presumption that the fraudulent transfers did not render Rose Ann insolvent, and because Plaintiff has offered no evidence to support his allegations of insolvency, Plaintiff's claims of fraudulent conveyance fail under DCL ¶ 273.

### 3. *Conspiracy and Fraud*

In order to establish fraud, Plaintiff must prove: (i) a misrepresentation or material omission of fact which was false and known to be false; (ii) made for the purpose of inducing the other party to rely on it; (iii) justifiable reliance of the other party; and (iv) injury. *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (N.Y. 1996)); *Ulteras v. Aegis Funding Corp.*, 2013 WL 789612, at *2 (E.D.N.Y. Mar. 1, 2013). Plaintiff must prove these elements by clear and convincing evidence. *See Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06-CV

3893, 2010 WL 446042, at *11 n. 31 (E.D.N.Y. Feb. 1, 2010) (citing *Merril Lynch & Co., Inc. v.*

*Allegheny Energy, Inc.,* 500 F.3d 171, 181 (2d Cir. 2007)); *accord Fresh Meadow Servs., LLC v.*

*RB 175 Corp.*, No. 04-cv-4767, 2013 WL 527100, at *3 (E.D.N.Y. Feb. 2013).

Defendants argue that no misrepresentations of fact were made. Defs.' Pre-Trial Mem. at 11; Rose Ann Amato Post-Trial Mem. at 22. However, based on the Court's findings of fact, the Court determines that the primary material misrepresentation at issue here is Rose Ann's representation to Plaintiff that the funds from the reverse mortgage line of credit were being used for the care of Anna Perrone. [27] Alternatively, Rose Ann neglected to inform Plaintiff of the fact that the funds from the monthly increases of the reverse mortgage line of credit were being used to pay the personal bills and expenses of Defendants and of Jack's Pizzeria.

According to Defendants, Plaintiff was, in any case, fully capable of examining the bank records of the accounts and failed to exercise due diligence. Thus, Plaintiff cannot establish justifiable reliance. Defs.' Pre-Trial Mem at 11; Post-Trial Mem. of Rose Ann Amato at 22. In reviewing the issue of justifiable reliance, the Court examines "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Landeskbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 Fed. App'x 679, 682 (2d Cir.

---

[27] Plaintiff alleges that Defendants misrepresented to him that "he should not worry about Anna Perrone; that she was being well taken care of; never complained about residing in the same house with Anna Perrone; never complained about the care of Anna Perrone; never stated that they were spending money out of pocket to pay for babysitters or aides for Anna Perrone; never stated that they were diverting money from the reverse mortgage line of credit for their benefit; never complained about a lack of funds in the name of Anna Perrone to pay for [the] care of Anna Perrone or about the finances of Anna Perrone except on one occasion in or about the latter part of 2005 . . . ." SAC ¶ 122.

2012) (citing *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996)). Whether a plaintiff's reliance is reasonable depends on the entire context of the transaction, including factors such as its complexity and magnitude, the parties' level of sophistication, and the content of any agreements between them. *Woori Bank v. RBS Securities, Inc.*, 910 F. Supp. 2d 697, 701 (S.D.N.Y. 2012). "New York courts are generally skeptical of claims asserted by sophisticated businessmen engaged in major transactions [who] enjoy access to critical information but fail to take advantage of that access." *See Merril Lynch*, 500 F.3d at 181.

Here, notwithstanding the fact that Plaintiff operated several restaurants *seriatim*, the Court does not find him to be "a sophisticated business man engaged in a major transaction." Even if Plaintiff would have reviewed bank account statements during the relevant time period, Plaintiff was not fully apprised of the monthly expenses of Anna Perrone, which were uniquely known to Rose Ann, who managed Plaintiff's finances after her stroke. Plaintiff may have gleaned some information from the bank records -- for example, a number of checks paid for Defendants' own personal purposes. However, given the numerous payments made to cash (which Defendants continue to represent were used for the care of Anna Perrone) and the intermingling of Defendants' own monies into the accounts where the reverse mortgage line of credit funds were deposited, an examination of these records may not have revealed Defendants' fraud. Further, it is unclear whether Plaintiff even had the account information for the Bank of America account Rose Ann opened in in Florida, from which the majority of the reverse mortgage line of credit funds were misappropriated. Therefore, even if Plaintiff had exercised due diligence, he may have still justifiably relied on Rose Ann's own representations that the

funds from the reverse mortgage line of credit were being used for the care of Anna Perrone. This is especially true since Plaintiff and Rose Ann had a relationship of trust and confidence during the relevant time period – they were brother and sister. *Bice v. Robb*, No. 07 Civ. 2214, 2012 WL 762168, at *7 (S.D.N.Y. Mar. 9, 2012) (noting that a family relationship may establish a finding that a confidential or fiduciary relationship exists*); Halvorsen v. Sheive*, No. 02-CV-6187P, 2004 WL 627939, at *6 (W.D.N.Y. Feb. 10, 2004) (family relationship relevant to (but not determinative of) a finding that a confidential relationship exists between parties). Rose Ann herself testified that she and her brother had a loving and trusting relationship. Tr. 336. During the relevant time period, Rose Ann and Plaintiff made joint decisions and conferred with regard to Anna Perrone's care. *Id*. Defendants have never argued that a relationship of trust and confidence did not exist between Plaintiff and Rose Ann at the time of the alleged misrepresentations/omissions.[28]

Finally, assuming Rose Ann informed the Plaintiff that the increases to the reverse mortgage line of credit were to be used for her mother's care, as she herself contends, Rose Ann was certainly "aware of the use to which the information would be put and supplied it for that purpose." *See, e.g., Landeskbank* , 478 Fed. App'x at 682. The evidence indicates that Rose Ann's misrepresentations or omissions were made to intentionally mislead the Plaintiff, to conceal the nature of Defendants' wrongful acts, and to prevent any due diligence on the part of Plaintiff. Plaintiff justifiably relied on these misrepresentations and omissions of fact to his

---

[28] The Court also notes that, where a fraud action is based on an omission, the plaintiff must prove an affirmative duty to disclose material information and failed to do so. *Ball v. Cook*, No. 11 Civ. 5926, 2012 WL 4841735, at *9 (S.D.N.Y. Oct. 9, 2012); *3801 Beach Channel, Inc. v. Shvartzman*, No. 05-CV-0207, 2010 WL 6471990, at *3 (E.D.N.Y. Sept. 30, 2010). Such a duty arises, for example, where the parties are in a fiduciary or confidential relationship with each other. *Ball*, 2012 WL 4841735, at *9; *Shvartzman*, 2010 WL 6471990, at *3. As outlined above, the Court finds that such relationship existed between Plaintiff and Rose Ann during the relevant time priod.

detriment, *i.e.*, the misrepresentations served to prevent Plaintiff from exercising due diligence, all while Defendants increasingly continued to misappropriate Plaintiff's vested interest in the proceeds from the sale of the Premises. Based on the context here, Plaintiff's reliance on Rose Ann's misrepresentations (or omissions) was reasonable and justified. *See, e.g., Landeskbank* , 478 Fed. App'x at 682; *Woori Bank*, 2012 WL 6703352, at *3.

To plead a cause of action for conspiracy, a plaintiff must allege the primary tort (for example, fraud) and the following four elements: (i) a corrupt agreement between two or more parties; (ii) an overt act in furtherance of the agreement; (iii) the parties' intentional participation in the furtherance of the plan or purpose; and (iv) damage or injury. *See Wells Fargo Bank, N.A. v. National Gasoline, Inc.*, No. 10-CV-1762, 2013 WL 168079, at *3 (E.D.N.Y. Jan 16, 2013) (citing *Pope v. Rice*, No. 04-cv-4171, 2005 WL 613085, at *13 (S.D.N.Y. Mar. 14, 2005)); *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 432 (E.D.N.Y. 2012) (citing *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991)). "[T]he Defendants' intentional participation in furtherance of the conspiracy may be inferred from the overt acts taken by them." *Emerald Asset Advisors,* 895 F. Supp. 2d at 432 (citing *Andre Emmerich Gallery, Inc. v. Segre,* No. 96 Civ. 889, 1997 WL 672009, at *5 (S.D.N.Y. Oct. 29, 1997)); *Sea Trade Maritime Corp. v. Coutsodontis*, No. 09 Civ. 488, 2012 WL 3594288, at *8 (S.D.N.Y. Aug. 6, 2012) (citing *Cleft of the Rock Found. V. Wilson*, 992 F. Supp. 574, 582 (E.D.N.Y. 1998)).

In their response to Plaintiff's allegations of conspiracy, Defendants merely maintain that "there is no evidence of any agreement or conspiratorial misconduct." Defs.' Pre-Trial Mem. at 11; Rose Ann Amato Post-Trial Mem. at 22. Rose Ann also claims that proof of Jack Amato's

knowledge of the Agreement is insufficient without some evidence of "joint conduct." Rose Ann Amato Post-Trial Mem. at 22.

The Court finds sufficient evidence to support Plaintiff's allegations of conspiracy based on fraud. The Court finds that a corrupt agreement existed between Rose Ann and Jack Amato, *i.e.*, Rose Ann and Jack Amato agreed to divest the Premises of equity through the increases in the reverse mortgage line of credit and to keep the entirety of the funds from the sale of the Premises for themselves. The Court makes this finding based on Defendants' inconsistent testimony regarding the Agreement and the reverse mortgage line of credit, as outlined in Section II(C)(3), *supra*. Further, the Court finds numerous overt acts in furtherance of the conspiracy. For example, the increases in the reverse mortgage line of credit and the frequent payments of Defendants' personal expenses and the expenses of Jack's Pizzeria all constitute overt acts in furtherance of the conspiracy. These overt acts, along with the other evidence presented in this case, are sufficient for a finding of Defendants' intentional participation in furtherance of the conspiracy. Plaintiff has also proved damages, as outlined in Section III(E), *infra*.

### 4.    *Tortious Interference*

Plaintiff has not made out a sufficient claim against Jack Amato for tortious interference with contract. To prove a claim for tortious interference as to Jack Amato, Plaintiff must establish:  (1) the existence of a valid contract between Plaintiff and Rose Ann; (2) Jack's knowledge of that contract; (3) Jack's intentional procurement of Rose Ann's breach of that contract without justification; (4) actual breach of that contract without justification; and (5) damages resulting from the breach. *See Valley Lane Industries Co. v. Victoria's Secret Direct*

*Brand Mgmt, L.L.C.*, 455 Fed. App'x 102, 104 (2d Cir. 2012) (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996)); *Advanced Mktg. Grp., Inc. v. Bus Payment Sys., LLC*, 300 F. App'x 48, 50 (2d Cir. 2008) (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006)).  With respect to the third element, Plaintiff must also allege that the breach would not have occurred "but for" Jack Amato's conduct.  *RSM Production Corp. v. Fridaman*, 387 Fed. App'x 72, 74 (2d Cir. 2010) (finding plaintiff failed to plausibly plead that defendants' conduct caused the injury alleged); *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) (finding no tortious interference because plaintiff did not demonstrate that "there would not have been a breach but for the activities of defendants"); *International Minerals & Resources, S.A. v. Bomar Resources, Inc.*, 5 Fed. App'x 5, 8 (2d Cir. 2001) (noting that the causation required in a tortious interference with contract action is that "'but for' the activities of the defendant, there would have been no breach of contract"); *JBC Holdings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 534-535 (S.D.N.Y. 2013) (noting that, in a tortious interference with contract action, plaintiffs must allege that third party's actions were the "but for" cause of their injury); *MGR Meats Inc. v. Schweid*, No. 10-CV-3068, 2012 WL 6675123, at *2 (E.D.N.Y. Dec. 21, 2012) ("Plaintiff must also allege that the breach would not have occurred 'but for' the conduct of the defendants.") (citing *Friedman v. Wahrsager,* 848 F. Supp. 2d 278, 297 (E.D.N.Y. 2012)).

Plaintiff has proven the existence of a valid Agreement between Rose Ann Amato and Joseph Perrone (Pl.'s Ex. 1) and Judge Platt has previously found that this Agreement constituted a valid contract between Rose Ann and Joseph (*Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) [DE 78].  Judge Platt also previously held that Rose Ann breached the

Agreement, and that Plaintiff was entitled to damages. *Id.* However, based on the full record, the Court concludes that Plaintiff's claim fails because he has not sufficiently proven that "but for" the activities of Jack Amato, there would have been no breach of contract.

The Court has already found that Jack Amato was aware of the Agreement between Joseph Perrone and Rose Ann. Jack's contradictory testimony with respect to the Agreement, along with the other factual circumstances developed in the record, suggests that Jack Amato likely intentionally encouraged Rose Ann to breach the Agreement. *See, e.g.,* Section II(C)(3). However, there is no evidence, circumstantial or otherwise, that, "but for" Jack's actions, Rose Ann would not have breached the Agreement. In fact, the circumstantial evidence indicates that Rose Ann is at least as much to blame for the breach of contract as her husband. For example, Rose Ann -- not Jack -- attended the closing of the sale of the Premises in New York. Rose Ann -- not Jack -- deposited the checks from the closing into her own bank account, when she alone had access to other bank accounts where Joseph Perrone could more easily access the money. Although the Court has found that Jack was aware of this breach and probably encouraged it, and even that Defendants conspired to deprive Plaintiff of the equity in the Premises and the proceeds of the sale, Plaintiff has not proved that "but for" the activities of Jack Amato, there would have been no breach of the Agreement, as required under the relevant precedents. *See RSM Production* 387 Fed. App'x at 74; *Sharma*, 916 F.2d at 828; *International Minerals*, 5 Fed. App'x at 8; *JBC Holdings*, 2013 WL 1149061, at *16; *MGR Meats*, 2012 WL 6675123, at *2.

### 5. *Constructive Trust*[29]

In ruling on Defendants' Motion to Dismiss, Judge Platt dismissed Plaintiff's constructive trust claims relating to the proceeds from the sale of the Premises as duplicative of

---

[29] Although technically an equitable remedy and not a cause of action, for the purpose of convenience, the Court will examine this specific request for relief here.

Plaintiff's breach of contract claim, because the Agreement covered those claims. *See Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) [DE 78] at 20-21. As Judge Platt's decision explains, a constructive trust may not be imposed where there is a valid written agreement. *See id.* at 20-21 (citing *In re First Cent. Fin. Corp.*, 377 F.3d 209, 214 n.4 (2d Cir. 2004); *Stylesite Mktg.*, 253 B.R. 503, 507-8 (Bankr. S.D.N.Y. 2000)). However, no valid contract exists with respect to the reverse mortgage line of credit funds. Thus, Judge Platt allowed Plaintiff's constructive trust claims for potential funds not covered by the Agreement to survive Defendant Jack Amato and former Defendant Jack's Pizzeria's motion to dismiss. *See Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) [DE 78] at 20-21. In the SAC, Plaintiff requests that a constructive trust be imposed on all of the proceeds of the reverse mortgage line of credit diverted and misappropriated by, and to or for the use and benefit of Defendants. SAC ¶ 138.

"New York law requires four elements to prove a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment. *In re Ades and Berg Grp. Investors*, 550 F.3d 240, 245 (2d Cir. 2008) (citing *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (1976)). Further, "[t]he New York Court of Appeals has explained that 'equity and good conscience' are the 'fundamental requirement[s] for imposition of a constructive trust.'" *Ades and Berg Grp. Investors*, 550 F.3d 240 at 245 (quoting *Matter of the Liquidation of New York Agency & other Assets of Bank of Credit & Commerce Int'l S.A.*, 90 N.Y.2d 410, 424 (1997)).

Indeed, the imposition of a constructive trust is an equitable remedy, soundly within the Court's discretion. *Bice v. Robb*, 2013 WL 535783, at *1 (2d Cir. Feb. 14, 2013) (citing *In re Flanagan*, 503 F.3d 171, 179-80 (2d Cir. 2007). However, the equitable remedy of a

78

constructive trust is only appropriate if "the party seeking relief … demonstrate[s] that [its] remedies at law are incomplete and inadequate to establish substantial justice." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) (alterations in original) (citing *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 262 (2d Cir. 2002)); *see also In re First Central Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004) (noting that "New York courts have clarified that, as an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate").

Plaintiff does not outline his claim for constructive trust in either his pre- or post-trial briefs. Defendants argue that no constructive trust should be imposed because "there is nothing unjust about [Defendants'] conduct" with respect to the "reimbursements" for the care of Anna Perrone. Defs.' Pre-Trial Mem. at 11. Further, Rose Ann argues that Plaintiff had no prior interest in the funds from the reverse mortgage line of equity. Rose Ann Amato Post-Trial Mem. at 23.

As discussed in Section III(D)(3), Plaintiff and Rose Ann had a relationship of trust and confidence at the relevant time here, satisfying the first element necessary for the imposition of a constructive trust. *See* Section III(D)(3). Further, the Court finds that, based on the record, Rose Ann made an express or implied promise to Plaintiff that the funds from the reverse mortgage line of credit would be used for the care of Anna Perrone. The record shows that the reverse mortgage line of credit was expressly created to provide funds for the care of Anna Perrone, based on Rose Ann's representation that Anna Perrone's money was "running low." Tr. 46-47; 241.

The Court also finds that Plaintiff's equity in the Premises was transferred to Defendants based on their promises (or implied promises). Defendants assert that Plaintiff was made aware of the increases to the reverse mortgage line of credit and that Plaintiff was told that these monies were to be used for the care of Anna Perrone. In contrast, Plaintiff contends that he never was informed of the increases, but that there was an initial promise (or implied promise) that the monies from the reverse mortgage line of credit would be used for the care of Anna Perrone. Under either interpretation, the Plaintiff relied on (i) Defendants' representation that the increased monies from the reverse mortgage line of credit would be used for the care of Anna Perrone; or (ii) the implied promise that these funds would be used for Anna Perrone. As a result of that reliance, Plaintiff allowed the transfer of his interest in the equity of the Premises to Rose Ann through the opening of the reverse mortgage line of credit and/or the increases in the monthly deposits.

The Court rejects Rose Ann Amato's argument that Plaintiff had no prior interest in this property. Judge Platt already determined that when Joseph Perrone signed the Agreement, and upon the transfer of the title of the Premises to Rose Ann, Joseph Perrone "received rights in that Home and the proceeds therefrom." *Perrone v. Amato*, No. 09-CV-316 (E.D.N.Y. Aug. 30, 2010) [DE 78] at 25. Further, Judge Platt pointed out that "the reverse mortgage on the Home, if abused, stripped the Home of equity. Thus, any alleged misappropriation of those funds would damage Plaintiff's vested interest in the Home." *Id.*

As outlined in Section III(E), Plaintiff has proven that certain of the funds from the reverse mortgage line of credit were used for Defendants' own personal purposes, and not for the care of Anna Perrone, thereby unjustly enriching Defendants. Consequently, Plaintiff has proven

all of the necessary elements necessary for the imposition of the equitable remedy of a constructive trust.

However, and as outlined below in Section II(E), *supra*, Plaintiff is already entitled to damages on his fraud and conspiracy causes of action with respect to the funds that were diverted from the reverse mortgage line of credit and used for the benefit of Defendants. *See* Section II(E), *supra*. Plaintiff's damages for fraud and conspiracy are the same damages that would be encompassed by the imposition of a constructive trust. Therefore, the Court in its discretion will not impose a constructive trust here, since Plaintiff already has an adequate remedy at law. *Motorola Credit*, 388 F.3d at 61; *Lucente*, 310 F.3d at 262; *First Central Fin.*, 377 F.3d at 215.

### E.    Damages

#### 1.    Breach of Contract

The Court has already found that, based on Judge Platt's prior ruling, Plaintiff is entitled to damages in the sum of $133,516.02, plus pre-judgment interest on this claim. Under New York law, "pre-judgment interest is recoverable as a matter of right in an action at law for breach of contract." N.Y. C.P.L.R §§ 5001(a), 5002 (McKINNEY 2013); *Lee v. Joseph E. Seagram & Sons, Inc.*, 592 F.2d 39, 41 (2d Cir. 1979); *Julien J. Studley, Inc. v. Gulf Oil Corp.*, 425 F.2d 947, 950 (2d Cir. 1969).

"Interest shall be recovered upon a sum awarded . . . because of an act or omission depriving or otherwise interfering with title to, or possession or employment of, property." N.Y. C.P.L.R. 5001(a). Further, the interest "shall be computed from the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. 5001(b) (McKINNEY 2013). Because the sale of the Premises occurred on June 23, 2008, that date is the appropriate date to begin the calculation, as

Judge Platt has previously indicated.  Therefore, Plaintiff is owed pre-judgment interest on his claim running from June 23, 2008.  New York has set the annual rate of interest at 9%.  N.Y. C.P.L.R. 5001(b).  The Court, in its discretion, however, is setting an end date for the accrual of pre-judgment interest based on the length of time that the Court's post-trial decision has been pending.  The Court finds that setting the start date for accrual of pre-judgment interest at June 23, 2008 and the end date at November 11, 2012 (six months after completion of the trial) is fair in these circumstances.   The pre-judgment interest on this claim shall be calculated by the Clerk of the Court.  Thus, the Court finds that Plaintiff is owed damages in the amount of $133,51602, plus interest, as against Defendant Rose Ann Amato on Plaintiff's breach of contract claim.

### 2.    *Fraudulent conveyance*

""[T]he proper remedy in a fraudulent conveyance claim is to rescind, or set aside, the allegedly fraudulent transfer, and cause the transferee to return the transferred property to the transferor."  *In re Adelphia Recovery Trust*, 634 F.3d 678, 692 (2d Cir. 2011) (citing *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir. 2006).  However, "where the assets fraudulently transferred no longer exist . . . a money judgment may be entered in an amount up to the value of the fraudulently transferred assets."  *Neshewat v. Salem*, 365 F. Supp. 2d 508, 521 (S.D.N.Y. 2005); *see also Cadle Co.*, 74 Fed App'x at 153.  New York law permits such money judgment to be entered against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance. *Cadle Co.*, 74 Fed App'x at 153; *Robert Smalls Inc. v. Hamilton*, No. 09 Civ. 7171, 2010 WL 3238955, at *5 (S.D.N.Y.

July 19, 2010); *RTC Mortgage Trust,* 171 F. Supp. 2d at 201-02; *Sullivan v. Kodsi,* 373 F. Supp. 2d 302, 309 (S.D.N.Y. 2005).[30] However, the DCL "protects the rights of certain transferees who paid 'fair consideration' for assets without knowledge of the fraud at the time of the purchase.'" *Olympia*, 2011 WL 9933296, at *12 (citing N.Y. DEBT. & CRED. LAW § 278(1) (McKinney 2013); *HBE Leasing v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995) (noting policy of "protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme)); *In re Jacobs*, 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008) (noting that the DCL provides protection to an innocent purchaser for value).

As analyzed above, the Court has found that Plaintiff proved his fraudulent conveyance claim with respect to Plaintiff's share of the funds from the sale of the Premises ($133,516.02 ). Plaintiff has also proven fraudulent conveyance as to certain funds fraudulently transferred from the accounts where the reverse mortgage line of credit was deposited. Although the total amount of the funds the parties stipulated to as having been transferred is $47,401.44, Plaintiff can only assert a claim to half of this amount, or $23,700.72, since he was only entitled to half of the proceeds from the sale of the Premises. Plaintiff seeks a ruling directing that the transfers be set aside and vacated, and to the extent they cannot be set aside and vacated, that the Court enter a money judgment against Jack Amato in the amount of Plaintiff's damages. *See* SAC ¶ 147.

---

[30] The Court also notes that some courts have found that pre-judgment interest may be awarded on such money judgment. *See Howland v. Resteiner*, No. 07 CV 2332, 2008 WL 1740531, at *6 (E.D.N.Y. Apr. 10, 2008); (citing *In re Cassandra Group,* 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (awarding prejudgment interest for a fraudulent transfer claim); *In re All American Petroleum Corp.,* 259 B.R. 6, 20-21 (Bankr. E.D.N.Y. 2001) (same)); *Shamis v. Ambassador Factors Corp.,* No. 2001 WL 25720, at *6 (S.D.N.Y. Jan. 10, 2001). However, the Court notes a general lack of case law on this issue, and, as Plaintiff has not requested pre-judgment interest on this claim, the Court declines to consider it.

Plaintiff also requests attorney's fees and punitive damages of at least $100,000. *Id.* Pl.'s Post-Trial Mem. at 25.

Plaintiff is entitled to a set aside of $133,516.02 of the monies deposited in Rose Ann's joint account. *See Adelphia Recovery*, 634 F.3d at 692; *Grace*, 443 F.3d at 189. Alternatively, the Court finds that, based on the record, Jack Amato participated in the fraudulent transfer and is not an "innocent purchaser for value." Therefore Plaintiff is entitled to damages against Jack Amato in the amount of $133,516.02. *Cadle Co.*, 74 Fed App'x at 153; *Robert Smalls*, 2010 WL 3238955, at *5; *RTC Mortgage Trust,* 171 F. Supp. 2d at 201-02; *Sullivan*, 373 F. Supp. 2d at 309. However, the Court notes that "[w]hen a plaintiff seeks compensation for the same damages under different legal theories of wrongdoing, the plaintiff should receive compensation for an item of damages only once." *Barkley v. United Homes, LLC*, 818 F. Supp. 2d 248, 257 (E.D.N.Y. 2012) (quoting *Gentile v. Cnty. of Suffolk,* 926 F.2d 142, 153 (2d Cir.1991); *Conway v. Icahn & Co.,* 16 F.3d 504, 511 (2d Cir.1994); *Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 449 (S.D.N.Y. 2010) ("[a] plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery.") (quoting *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995)); *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (same). Because Plaintiff cannot recover multiple damages for the same injury, and because Rose Ann is already liable for $133,516.02, plus pre-judgment interest, on Plaintiff's breach of contract claim, the Court finds Jack Amato jointly and severally liable with Rose Ann Amato for $133,516.02. Rose Ann is independently liable for the pre-judgment interest on the breach of contract claim.

Plaintiff is not entitled to damages of $23,700.72 based on the funds diverted from the reverse mortgage line of credit account. These monies went to pay the personal creditors of the Defendants as well as the creditors of Jack's Pizzeria, *i.e.*, contractors who were paid for services rendered. There is no evidence in the record showing that these transferees had any knowledge of the fraud at the time of the transfers. Thus, Plaintiff cannot obtain damages with respect to these funds under this cause of action. N.Y. DEBT. & CRED. LAW § 278(1) (McKinney 2013); *Olympia*, 2011 WL 9933296, at *12; *HBE Leasing*, 48 F.3d at 636.

Further, the Court finds that Defendants' actions do not merit an award of punitive damages. Under New York law, punitive damages may only be awarded where "the defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer." *Kuruwa v. Meyers*, No. 11-4926, 2013 WL 627733, at *2 (2d Cir. 2013) (citing *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118 (2d Cir.1986)); *see Cagan v. Gadman*, No. 08–CV–3710, 2012 WL 5422270, at *4 (E.D.N.Y. Oct. 31, 2012) (noting that "[i]n a fraud cause of action, punitive damages may only be recovered when the conduct in question is aimed at the public generally, involves a high degree of moral culpability, and rises to a level of 'such wanton dishonesty as to imply a criminal indifference to civil obligations'") (quoting *Ross v. Louise Wise Servs., Inc.*, 28 A.D.3d 272, 812 N.Y.2d 401223 (N.Y.S.2d 488, 499, 179 N.E.2d 497 (1961)). The Court finds that, based on the record here, Defendants' conduct, while rationally and morally objectionable, does not rise to such a high level of malicious conduct which would

warrant an award of punitive damages. Moreover, the conduct at issue was not aimed at the public generally. *Cagan*, 2012 WL 5422270, at *4.

Plaintiff is entitled to attorney's fees on his claim for fraudulent conveyance under DCL § 276. A Plaintiff may recover reasonable attorney's fees if he proves that both the transferor and the transferee acted with actual fraudulent intent. *In re Operations N.Y. LLC*, 490 B.R. 84, 96 (Bankr. S.D.N.Y. 2013) (citing N.Y. DEBT. & CRED. LAW § 276-a (MCKINNEY 2013)); *First Keystone*, 871 F. Supp. 2d at 123-124. The Court has already found that Rose Ann Amato acted with the requisite fraudulent intent to hinder, delay, or defraud the Plaintiff of his share of the proceeds from the sale of the Premises. The Court also finds that Jack Amato, as the transferee of the proceeds, acted with fraudulent intent. The Court bases this finding on the evidence in the record, including Jack Amato's own testimony regarding the Agreement and the funds from the sale of the Premises, outlined in Section II(C)(3), *supra*, which the Court found inconsistent, contradictory, and at times just not credible. The circumstantial evidence shows that Jack Amato intentionally received the proceeds from the sale of the Premises into his joint bank account with Rose Ann Amato, and that the money was deposited into this account to purposefully delay, hinder or defraud the Plaintiff. Consequently, Plaintiff's attorneys shall submit to the Court an appropriate attorney's fee application within 30 days of the entry of this Order. The Court reminds counsel that "[t]he party seeking reimbursement of attorneys' fees must demonstrate the reasonableness and necessity of hours spent and rates charged." *Finkel v. Omega Comm'n Servs., Inc.*, 543 F. Supp. 2d 156, 164 (E.D.N.Y. 2008) (citing *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir. 1983)). Thus, counsel "must support its request by providing contemporaneous time records reflecting, for each attorney and legal

assistant, the date, the hours expended, and the nature of the work done." *Cho v. Koam Medical Services PC,* 524 F. Supp. 2d 202, 209 (E.D.N.Y. 2007) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). Defendants will have 21 days thereafter to file any opposition to the fee application if they choose to do so.

### 3. *Conspiracy and Fraud*

On this cause of action, Plaintiff requests damages "believed to exceed the sum of $200,000," together with punitive damages. *See* SAC ¶ 147. "[T]he true measure of damages for fraud is indemnity for the actual pecuniary loss sustained as a direct result of the wrong." *Cagan*, 2012 WL 5422270, at *4 (citing *Tradex Global Master Fund SPC LTD v. Titan Capital Grp. III, LP,* 95 A.D.3d 586, 944 N.Y.S.2d 527, 528–29 (App. Div. 2012)); *Woods v. Sieger, Ross & Aguire, LLC*, No. 11 Civ. 5698, 2012 WL 1811628, at *8 (S.D.N.Y May 18, 2012) (the measure of damages in an action predicated on fraud is the actual pecuniary loss); *Healing Power, Inc. v. Ace Continental Exports, Ltd.*, NO. 07CV4175, 2008 WL 4693246, at *4 (E.D.N.Y. Oct. 17, 2008) (measure for damages in fraud action is actual pecuniary loss sustained as a result of the wrong). Further, "[g]iven that civil conspiracy is not an independent tort, it cannot have its own independent measure of damages; any damages attributable to [P]laintiff's conspiracy claim exists only *within* those damages that may be assessed for fraud." *Cagan*, 2012 WL 1071275, at *4 (citing *Hoeffner v. Orrick, Herrington & Sutcliffe LLP,* 85 A.D.3d 457, 458, 924 N.Y.S.2d 376, 377–78 (1st Dep't 2011) (emphasis in original)); *Barkley*, 818 F. Supp. 2d at 257 (noting that a conspiracy-to-defraud count cannot have its own independent measure of damages).

Further, although Plaintiff does not appear to request pre-judgment interest on this claim in the SAC, Plaintiff includes a general request for interest in his post-trial brief. Pl.'s Post-Trial Mem. at 25. In any case, "Under New York law, awarding pre-judgment interest on damages awarded for fraud is mandatory." *Gov't Employees Ins. Co. v. IAV Medical Supply, Inc.*, 2013 WL 764735, at *8 (E.D.N.Y. Feb. 8, 2013) (citing *In re Crazy Eddie Sec. Litig.,* 948 F.Supp. 1154, 1166 (E.D.N.Y. 1996)); *Wells Fargo Bank, N.A. v. National Gasoline, Inc.*, No. 10-CV-1762, 2013 WL 168079, at *8 n.8 (E.D.N.Y. Jan. 16, 2013). Plaintiff's damages must be proven by clear and convincing evidence. *See Merril Lynch*, 500 F.3d at 181 (noting that each element of a fraud claim must be proven by clear and convincing evidence); *Nader v. ABC Television, Inc.*, 150 Fed. App'x 54, 57 (2d Cir. 2005) (same).

Plaintiff's potential damages based on fraud and conspiracy are: (i) one half of the $47,401.44 that the parties have stipulated Defendants' used for their own personal purposes from the accounts where the reverse mortgage line of credit funds were deposited (or $23,700.72); (ii) one half of the $6,000, representing the check made out to "cash" and endorsed by Rose Ann (or $3,000); and (iii) one half of the $20,000 reimbursement Rose Ann allegedly claimed was owed to her when the reverse mortgage line of credit was opened (or $10,000). *See* Pl.'s Post-Trial Mem. at 10.

The Court declines to award Plaintiff damages of $3,000 and $10,000 on these claims. Plaintiff has not met his burden to prove entitlement to these damages under the clear and convincing evidence standard. While it is clear that Defendants diverted some of the funds from the reverse mortgage line of credit for their own purposes, Plaintiff has not proven by clear and convincing evidence that the $3,000 was diverted to Defendants. Further, Plaintiff has not

proven that $10,000 of the $20,000 reimbursement was not used for the care of Anna Perrone, particularly in light of the Court's finding that immediately prior to Rose Ann's request for this reimbursement, Anna Perrone's income was not sufficient to cover her monthly expenses.

However, with respect to the $23,700.72 diverted to Defendants' own personal purposes, the Court finds that Plaintiff has proven damages in this amount. The parties have stipulated that $47,401.44 of the monies from the accounts where the reverse mortgage line of credit funds were deposited were used for Defendants' personal debts and obligations, and for the benefit of Jack's Pizzeria. The Court has found that Defendants' fraud and conspiracy to defraud proximately caused Plaintiff's equity in the Premises to be divested in the amount of $23,700.72. Therefore, the Court finds that Plaintiff has proven damages in the amount of $23,700.72.

Plaintiff is also owed pre-judgment interest on this sum. *See Gov't Employees*, 2013 WL 764735, at *8; *Crazy Eddie*, 948 F.Supp. at 1166. New York's Civil Practice Law and Rules provides that pre-judgment interest shall be calculated "from the earliest ascertainable date the cause of action existed," but when "damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *Gov't Employees*, 2013 WL 764735, at *8 (citing N.Y. C.P.L.R. 5001 (MCKINNEY 2013)). The record shows that these damages were incurred from August 29, 2007 to June 11, 2008. SF 63, 69. Since these damages were incurred on approximately 35 different dates (*id.*), the Court picks an intermediate date for the calculation of these damages, namely, January 18, 2008.[31] Pre-judgment interest shall therefore be awarded for the period running from January 18, 2008 and ending November 11, 2012 for the reasons stated earlier in

_____

[31] This date was arrived at by calculating the number of days between August 29, 2007 and June 11, 2008 (287 days). The number was then divided in half (approximately 143 days) to obtain the midpoint between the two dates.

this decision.  Therefore, Plaintiff is owed pre-judgment interest at the statutory rate in New York on this amount, to be calculated by the Clerk of the Court.  Rose Ann and Jack Amato are therefore jointly and severally liable for $23,700.72 in damages, plus interest, on this cause of action.

The Court also finds that punitive damages are not merited on this claim.  Based on the record before the Court, Defendants' conduct here does not rise to the high level of malicious conduct required for an award of punitive damages under New York law.  *See Kuruwa*, 2013 WL 627733, at *2; *Cagan*, 2012 WL 5422270, at *4.

## III.    CONCLUSION

For the foregoing reasons, after carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, the Court concludes as follows:

- Judge Platt's prior ruling granting Plaintiff's claim for breach of contract fully disposes of that claim.  Plaintiff is owed damages in the amount of $133,516.02, plus pre-judgment interest running from June 23, 2008 to November 11, 2012, in an amount to be determined by the Clerk of the Court on this claim, as against Defendant Rose Ann Amato.

- Plaintiff has proven his claim under DCL § 276.  Plaintiff is entitled to a set aside of $133,516.02 of the monies deposited in Rose Ann Amato's joint account.  Alternatively, Plaintiff has proven damages in the amount $133,516.02 as against Jack Amato.  However, because Plaintiff cannot recover multiple damages for the same injury, the Court finds Jack Amato jointly and severally liable with Rose Ann Amato for damages in the sum of $133,516.02.  Rose Ann is independently liable for the pre-judgment interest on the breach of contract claim.

- Plaintiff's request for attorney's fees on his DCL § 276 claim is GRANTED.  Counsel is directed to submit a detailed application for attorney's fees within 30 days of the entry of this Order.  Plaintiff is not entitled to further damages on this claim.  Defendants shall have 21 days after the fee application is posted to ECF to file any specific opposition to the *amount* of fees requested by Plaintiff.  Plaintiff's entitlement to attorney's fees has already been established.

- Plaintiff has not proven his claims under DCL § 273.

- Plaintiff has proven his claims for fraud and conspiracy. Plaintiff is awarded $23,700.72 in damages on this claim, plus pre-judgment interest at the statutory rate running from January 18, 2008 until November 11, 2012, to be calculated by the Clerk of the Court. Rose Ann and Jack Amato are jointly and severally liable for these damages.

- Plaintiff has not proven his claim for tortious interference.

- Plaintiff's request for the imposition of a constructive trust is DENIED.

- Plaintiff's request for punitive damages is DENIED.

As noted, the Court intends to award attorneys' fees on the claim arising under DCL § 276. However, Plaintiff's counsel did not address the amount of the actual fees incurred. Thus, as noted, an additional submission on this issue will be required.

The Clerk of the Court is hereby directed to enter partial judgment as follows: in the amount of $133,516.02, jointly and severally against Defendants Rose Ann Amato and Jack Amato; pre-judgment interest running from June 23, 2008 to November 11, 2012 on the $133,516.02 independently against Defendant Rose Ann Amato on the breach of contract claim in an amount to be determined by the Clerk of the Court; $23,700.72, jointly and severally against Defendants Rose Ann Amato and Jack Amato on the fraud and conspiracy claim, along with pre-judgment interest running from January 18, 2008 until November 11, 2012, in an amount to be determined by the Clerk of the Court. The Clerk of the Court shall enter partial judgment consistent with this Memorandum of Decision and Order. Final judgment will be entered when the attorney's fees are resolved.

**SO ORDERED.**

Dated: Central Islip, New York
June 30, 2017


/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge